CONDEC CORPORATION, a New York corporation,
Plaintiff,

vs.

THE LUNKENHEIMER COMPANY, U. S. INDUSTRIES, INC. and
U. S. INDUSTRIAL CORPORATION, Delaware corporations,
Defendants.

*New Castle, June 2, 1967.*

354

*Richard F. Corroon* and *Hugh L. Corroon,* of Berl, Potter & Anderson, Wilmington, and Hays, Algase, Feuer, Porter & Spanier, New York City, for plaintiff.

*William E. Wiggin,* of Richards, Layton & Finger, Wilmington, for defendant The Lunkenheimer Co.

*George Tyler Coulson,* of Morris, Nichols, Arsht & Tunnell, Wilmington, and Patterson, Belknap & Webb, New York City, for defendants U. S. Industries, Inc. and U. S. Industrial Corporation.

MARVEL, Vice Chancellor: Plaintiff was organized during the early part of World War II under the name Consolidated Diesel Electric Corporation and has grown in the past ten years from a one plant operation employing six hundred fifty people to an enterprise operating ten plants and employing over two thousand persons. It manufactures, among other things, diesel operated generators, valves, and special-purpose military vehicles, ranging from aircraft refuelers to amphibious vehicles, a substantial part of its earnings being derived from military procurement of the type indicated. Its consolidated balance sheet for the year ending July 31, 1966, discloses total current assets of $22,755,000 and total current liabilities of $15,765,000. During the same period it purportedly made net sales of $45,847,000 and earned net income of $1,369,000. According to its prospectus of April 21, 1967, which invited tenders of stock from the stockholders of the defendant The Lunkenheimer Company, Condec's commercial

sales in fiscal 1966 accounted for 45% of its business and for approximately three-fourths of its profits. In order to pay for the more than 190,000 shares of Lunkenheimer stock which it bargained for on the basis of its April 21 offer and which it has now agreed to purchase, Condec will incur additional indebtedness of $8,250,000. Accordingly, following such acquisition, it will apparently be in debt on a short term basis in an amount in excess of $20,000,000. However, as of January 31, 1967, it reported retained earnings of $6,647,000 and a backlog of orders totalling approximately $100,000,000.

The defendant, The Lunkenheimer Company, has been in existence over one hundred years during which time it has engaged in manufacturing a variety of valves. These are marketed through a number of distributors many of whom have handled such defendant's products over periods of up to fifty years. Its consolidated balance sheet as of December 31, 1966, discloses total current assets of $9,545,152 and total current liabilities of $3,741,922. During the year 1966 it reported net sales of $23,322,655 and net income of $1,945,470. Lunkenheimer competes with Hammond Valve Corporation, a subsidiary of Condec. Earlier this year Lunkenheimer filed an action against Condec under the *Clayton* and *Sherman Acts* in which it sought injunctive relief against Condec's efforts to buy a controlling interest in Lunkenheimer stock. The grounds asserted were that such an acquisition would tend substantially to lessen competition because of Condec's ownership of Hammond Valve Corporation. On May 5, 1967, (268 *F.Supp.* 667), the United States District Court for the Southern District of New York declined to grant a preliminary injunction as prayed for. Lunkenheimer has appeared to be an attractive business acquisition to several modern diversified industries, and over recent months not only plaintiff and the defendant U. S. Industries, Inc., but also Textron, Inc., have each evinced an interest in establishing a business connection of some sort with Lunkenheimer.

On May 10, 1967, the defendant, United States Industries, Inc., entered into a contract with Lunkenheimer for the purchase of the latter's assets. This contract, if approved by a majority of the Lunkenheimer stockholders, will presumably result in U. S. Industries taking over operation of Lunkenheimer's business. U. S. Industries' consolidated balance sheets reflect total current assets of $68,689,308 and total current liabilities of $27,038,322 as of December 31, 1966.

Said report also discloses net sales for the year of $152,996,308. Its earning record, however, has been erratic in the recent past, and in its accounting it has made use of a tax-loss carry-forward which runs out this year.

Early in December, 1966, the president of Condec, Mr. Shafler, and a Mr. Russell, one of the latter's directors, requested and were granted a meeting with Lunkenheimer's president and other principal officers of the latter corporation in its offices in Cincinnati. Condec's initial proposal was that the two companies merge. However, these initial direct efforts to interest Lunkenheimer in a business combination with Condec failed. This meeting was followed by a second trip to Cincinnati on the part of Condec's president and one of its attorneys early in February, 1967, on the eve of a public invitation by Condec to Lunkenheimer's stockholders to tender their shares to a Condec subsidiary known as Conval for $36 per share. This second meeting led to outright rejection of Condec's overtures, including a refusal to grant Mr. Shafler's request to appear before Lunkenheimer's board of directors. Notwithstanding such rejection, Condec followed up its February 6 offer for tenders and acquired 21,000 shares of Lunkenheimer. The latter company, in the meantime, had entered into negotiations with Textron, Inc., looking towards a sale of its assets to such company. As a result of such negotiations, a formal agreement of purchase and sale was entered into on March 8, 1967. Condec then made a second public offer to purchase shares of Lunkenheimer as set forth in a prospectus dated April 21, 1967, in which it undertook on a "first come first served" basis to buy the first 190,000 shares of Lunkenheimer common stock offered for sale at a price of $50 per share plus one share of cumulative $10 par value preferred stock of Condec. The avowed purpose of this second offer was to increase the 21,000 shares of Lunkenheimer already held by Condec by an additional 190,000 shares, thereby causing Condec to become the holder of slightly more than half of the some 414,000 shares of Lunkenheimer common stock then outstanding.

In the meantime, The Lunkenheimer Company had issued an April 14 call for a special meeting of its stockholders for May 10, for the purpose of voting on the March 8 purchase agreement with Textron, a contract which provided for the sale of the assets and business

of Lunkenheimer for cash in an amount equal to $50 for each share of Lunkenheimer outstanding on a closing date fixed for May 15.

By May 5, however, Condec, as a result of its invitation for tenders of Lunkenheimer stock, had purportedly acquired sufficient irrevocable proxies to prevent a two-thirds vote in favor of the proposed sale of Lunkenheimer's assets to Textron, Inc., and by the time fixed for Lunkenheimer stockholders' meeting, the Textron offer had been withdrawn. The meeting, when convened, was indefinitely adjourned. By the close of business on May 9, the number of Lunkenheimer shares tendered to Condec totalled 191,017.

Anticipating, no doubt, the probable outcome of the Textron proposal, the president of U. S. Industries, Inc., who had been interested in Lunkenheimer for some time and whose company in February, 1967, had unsuccessfully sought to acquire the Lunkenheimer business at a price of $46 for each of its outstanding common shares, had written to the president of Lunkenheimer on May 1, as follows:

"If you find yourself unable to consummate your deal with Textron, we would be glad to meet with you or your representatives.

"We would have no interest in talking unless we are invited by the Lunkenheimer management."

Such overture was followed by hurriedly called meetings between representatives of Lunkenheimer and those of U. S. Industries, and on May 10 these two corporations entered into a plan and agreement of reorganization under the terms of which Lunkenheimer agreed to transfer to U. S. Industries its entire business and assets other than a small amount of cash to be applied to the former's reorganization expenses and those shares of the special preference U. S. Industries stock to be tendered by the buyer in return for Lunkenheimer's business and assets. This agreement was preceded by the execution of a so-called stock purchase agreement of May 9 under the terms of which U. S. Industrial Corporation, a wholly owned subsidiary of U. S. Industries, Inc., subscribed for 75,000 shares of authorized but unissued shares of Lunkenheimer common stock in exchange for 75,000 shares of the same class of preference stock of U. S. Industries which made up the stated consideration for the purchase of Lunkenheimer by U. S. Industries.

It is the claimed invalidity of the issuance of the 75,000 authorized but unissued shares of Lunkenheimer to U. S. Industrial Corporation which is the matter for decision here.[1] In its complaint plaintiff alleges, on information and belief, that the sale of such shares by Lunkenheimer "* * * served no legitimate corporate purpose but was designed by the officers and directors of Lunkenheimer solely to serve their personal interests * * *", that "* * * the primary purpose of said sale was to frustrate control of Lunkenheimer by its majority stockholder, Condec * * *" and that "* * * said sale was not made in good faith or in the exercise of prudent judgment but was made with precipitous haste with insufficient consideration or opportunity for consideration of the interest of the corporation or its stockholders * * *".

According to the Lunkenheimer statement to its stockholders made in connection with the call of a stockholders' meeting to vote on the proposed sale of Lunkenheimer assets to Textron, Inc., the principal officers of Lunkenheimer were, as of December 31, 1966, the holders of options for over 6,000 shares of Lunkenheimer stock. One of the terms of the agreement with Textron provided that officers and employees of Lunkenheimer holding matured stock options of that company mig. exercise them prior to the closing date fixed in the sale of assets agreement. In the May 10 agreement between U. S. Industries and Lunkenheimer the former agreed to "* * * assume, defend, pay, perform, or discharge all liabilities, obligations, and commitments of the Seller outstanding or unperformed on the Closing Date, whether fixed or contingent, matured or unmatured on such date * * *" other than taxes involved in the sale of Lunkenheimer's assets and the latter's expenses in connection with such transaction. Presumably such commitment would serve to protect the option rights of Lunkenheimer's principal officers as well as any other contractual

1. Trial of this case was accelerated at the request of the litigants because as late as May 15 it was contemplated that Condec would be required under its loan agreements with certain banks to make a decision as to whether or not it would buy tendered shares of Lunkenheimer on or before May 19. On the afternoon of May 15, the lending banks agreed to waive a condition of their agreement to the effect that the tender offer must result in Condec becoming a majority holder of Lunkenheimer stock. Since such waiver none of the litigants has sought to reopen the record for the purpose of introducing additional evidence and all urge a speedy determination of the issue presented.

rights[2] which may exist. However, beyond the question of specific property rights of key personnel of Lunkenheimer, it would appear to be implicit in the testimony of both Mr. Shafler and Mr. Arnall that the continued employment of Lunkenheimer's present management in any successful takeover of such company by Condec has become increasingly unlikely as Condec's efforts to acquire a substantial interest in Lunkenheimer have continued to be thwarted. On the other hand, it appears that in the event of consummation of its May 10 agreement with U. S. Industries that Lunkenheimer's operations may be expected to continue along their present course. Thus, Mr. Arnall testified that upon consummation of the May 10 agreement his "connection" would be with U. S. Industries, and, on direct examination, had difficulty in visualizing any change in Lunkenheimer's continuing operations notwithstanding a sale of its assets to U. S. Industries. · Finally, while Article 5 of the agreement with U. S. Industries calls for resignations of the officers and directors of Lunkenheimer's subsidiaries, no mention is made therein of the future status of Lunkenheimer's board and officers.

Asked for his reasons for rejecting Condec's overtures, Mr. Arnall, president of Lunkenheimer, testified that prior to his initial meeting with Condec's president, Mr. Shafler, he had had Mr. Huser, a Lunkenheimer director and financial vice president, investigate reports on Condec prepared by Moody's Industrial Reference and by Dun and Bradstreet. Mr. Huser also obtained a copy of Condec's latest annual report and talked to a financial man at White-Weld Company. On the basis of these documents and conversations Mr. Huser prepared his own brief summary, a document which questioned Condec's ability to pay for the many projects on which it had embarked, particularly if its business should run into difficulties. Mr.

---

2. Mr. Arnall testified that as of May 15 no employment contracts had been entered into between U. S. Industries and Lunkenheimer's management, and that none had in fact been offered:

Article 6(VIII) of the Lunkenheimer-U. S. Industries contract does provide, however, that the former shall not without U. S. Industries written consent:

"Increase in any manner the compensation of any of its officers or executive employees or pay or agree to pay any pension or retirement allowance not required by an existing plan or pattern to any such officers or employees, or commit itself to any additional pension, retirement or profit sharing plan or agreement or employment agreement with or for the benefit of any officer, employer or other person * * *."

Arnall summarized his apparent business objections to acceding to a connection with Condec as follows: Its debt was excessive, its government business disproportionate, and its profit record low in relation to its sales. He also contended that Condec's tender offer ignored 49% of Lunkenheimer's shareholders and noted that Condec had a reputation of being dilatory in payment of its bills. He added, in conclusion, that the rest of the members of the board of Lunkenheimer were equally unenthusiastic about Condec. Mr. Arnall went on to testify that revived discussions with U. S. Industries were held on the week-end of May 7th and that a sale of assets was agreed to by the board of Lunkenheimer because U. S. Industries' proposal was fair and because it benefited all of Lunkenheimer's stockholders. He also stated that such agreement was approved by Lunkenheimer's board because it provided a fine management for Lunkenheimer's affairs. It was also noted by Mr. Arnall that those stockholders of Lunkenheimer who might exchange their stock for shares of U. S. Industries stock would not, in his opinion, be taxed on the immediate transaction. On the other hand, those stockholders of Lunkenheimer who have agreed to sell their stock to Condec must pay a tax on their gain.

During the course of May 7, an agreement in principle was reached between representatives of U. S. Industries and those of Lunkenheimer calling for a tax free exchange of approximately 416,000 shares of U. S. Industries special preference stock for Lunkenheimer's assets. Announcement of such agreement was made in a telegram dated 2:00 a.m. May 8 and in the May 8 edition of the Wall Street Journal. The sale, if approved, was to be followed by an offer to Lunkenheimer's shareholders to turn in their shares in exchange for shares of U. S. Industries on a share for share basis. No mention was made in such releases of the 75,000 authorized but unissued shares of Lunkenheimer which were the subject of a stock purchase agreement entered into between Lunkenheimer and U. S. Industrial Corporation, a wholly owned subsidiary of U. S. Industries, on the following day, May 9. This latter agreement, made in contemplation of the sale of assets agreement between Lunkenheimer and U. S. Industries, was conditioned on the consummation of the latter transaction. In other words, in the event that the sale of assets failed of consummation "* * * the parties agree that Lunkenheimer will repurchase, and Industrial will resell to Lunkenheimer, the common shares of Lunkenheimer issued pursuant to this Agreement, and Lunkenheimer

will return to Industrial, and Industrial will receive and accept in full payment, the 75,000 shares of U. S. I. preference stock * * * and the Agreement shall be of no further force or effect."

According to defendants, the exchange of 75,000 shares of Lunkenheimer for a like number of shares of U. S. Industries was made in order to preserve the former's existence for tax purposes as well as to avoid a possible violation of the Delaware statutory voting requirement for a corporate dissolution, it being contemplated that U. S. Industrial would not turn in its Lunkenheimer shares upon completion of the contractual reorganization. The possibility of a so-called de facto dissolution of Lunkenheimer was allegedly thereby avoided although the business purpose for the continuation of the latter corporation as a viable entity appears obscure and presents troublesome tax considerations. It is conceded that present Lunkenheimer stockholders who might receive U. S. Industries shares would be subject to a capital gain tax on the sale of the latter.

It is also clear that the immediate result of the issuance of 75,000 additional shares of Lunkenheimer stock was to abort the effect of Condec's apparently successful campaign for tenders of a majority of Condec's stock. What then was the actual reason for the issuance of such shares as a condition precedent to the transfer of Lunkenheimer's assets to U. S. Industries? Lunkenheimer's matching number of 75,000 U. S. Industries shares would, if they remain in the Lunkenheimer treasury, be under the buyer's control, so that the actual number of shares to be paid for Lunkenheimer's assets and distributed to Lunkenheimer stockholders number 416,000. Should the sale of assets not be consummated, the exchange of stock agreement will, of course, be cancelled.

In view of the haste with which the basic Lunkenheimer-U. S. Industries transaction was hammered out in the latter's offices in New York over the week-end of May 7 followed up by a decision to have Lunkenheimer issue 75,000 new shares, when a substantially smaller number of shares would have served the purpose of preserving Lunkenheimer as a corporate entity, I have reached the conclusion that the primary purpose of the issuance of such shares was to prevent control of Lunkenheimer from passing to Condec and to cause such control to pass into the hands of U. S. Industries.

While Article IX § 3 of the *Constitution of the State of Delaware,* and Title 8 *Del.C.Ann.* § 152 govern the quality of

the consideration required to be paid for subscriptions to or purchases of the capital stock of a Delaware corporation, shares may not be issued for an improper purpose such as a take-over of voting control from others. As stated in *Yasik v. Wachtel*, 25 *Del.Ch.* 247, 17 *A.2d* 309:

> "It is fundamental that directors stand in a fiduciary relation to the corporation and its shareholders, and that their primary duty is to deal fairly and justly. It is a breach of this duty, wholly apart from any consideration of pre-emptive rights, for directors to make use of the issuance of shares to accomplish an improper purpose, such as to enable a particular person or group to maintain or obtain voting control, against the objection of shareholders from whom control is thereby wrested. *Kingston v. Home Life Ins. Co.*, 11 *Del.Ch.* 258, 101 *A.* 898; *Bowen v. Imperial Theatres, Inc.*, 13 *Del.Ch.* 120, 115 *A.* 918; *Elliott v. Baker*, 194 *Mass.* 518, 80 *N.E.* 450; 11 *Fletcher Cyc. of Corporations*, § 5160, pp. 317-320; 19 *C.J.S. Corporations* §§ 794-796, pp. 174-177."

■■ The converse of the above rule is also established, namely that corporate machinery may not be manipulated so as to injure minority stockholders:

> "As a starting point it must be conceded that action by majority stockholders having as its primary purpose the 'freezing out' of a minority interest is actionable without regard to the fairness of the price. See *Allaun v. Consolidated Oil*, 16 *Del.Ch.* 318, 147 *A.* 257; *Bodell v. General Gas*, 15 *Del.Ch.* 420, 140 *A.* 264." *Bennett v. Breuil Petroleum Corp.*, 34 *Del.Ch.* 6, 99 *A.2d* 236.

■■ This does not mean that stock issued to raise money to eliminate a deficit is to be invalidated merely because defendant directors thereby fairly avail themselves of an opportunity to acquire additional shares to fortify their natural desire to remain in control, *Aldridge v. Franco-Wyoming*, 28 *Del.Ch.* 320, 326, 42 *A.2d* 879. Where, however, the objective sought in the issuance of stock is not merely the pursual of a business purpose but also to retain control, it has been held to be a mockery to suggest that the "control" effect of an agreement in litigation is merely incidental to its primary business objective. In matter of *Seminole Oil and Gas Corporation*, 38 *Del.Ch.* 246, 150 *A.2d* 20.

While the record before me is replete with accounting reasons in justification of Lunkenheimer's continuing fight against Condec's efforts to assimilate its business by merger or otherwise, I do not find that type of direct investigation, professional consultation or evidence of contradiction in the actions and explanations of corporate purpose on the part of Condec officials which would lead the management of Lunkenheimer justifiably to believe that Condec's aspirations represented a reasonable threat to the continued existence of Lunkenheimer, or at least its existence as now visualized by its management, *Cheff v. Mathes (Sup.Ct.Del.)* 199 *A.2d* 548. There is no evidence of record that the management of Condec in the past has either substantially altered or threatened to alter the business of any company with which it has formed a business association, and its tender offer to Lunkenheimer's stockholders represented the first time it has employed this device for the purpose of establishing a business relationship with another corporation. In other words, I do not believe that we are here concerned with a situation in which the intent behind the stock issue here under attack is the maintenance of what Lunkenheimer's management believes to be proper business practices; and what of Lunkenheimer's lack of concern for its stockholders who have jumped at the opportunity to sell for cash? I am also of the opinion that the concern expressed on the stand by Mr. Arnall and by Mr. Huser about Condec's debt and the alleged disregard by Condec of Lunkenheimer's minority stockholders was not based on objective investigation. It may be that other factors such as Condec's rate of growth would be equally significant to an impartial appraiser, and Lunkenheimer's principal officers have disregarded the fact that Condec's initial overture visualized a merger, which, had it been negotiated, would have dealt uniformly with all of Lunkenheimer's stockholders. Rather than establishing a methodical investigation into the affairs of Condec and the unearthing of threats to Lunkenheimer's future by a devious and uncandid raider, the evidence before me established that from the time that Lunkenheimer became aware of Condec's intentions, those in authority at said corporation's offices, on the basis of a minimal investigation, resolved firmly to avoid direct negotiations with such corporation. This state of mind has continued throughout 1967 to date and appears in acts such as forcing Condec to resort to mandamus in order for it to secure a list of Lunkenheimer's stockholders as well as in the filing of an anti-trust action against Condec, premised, at least in part, according to the trial judge,

on an apparent aversion to being forced into a business association with Hammond Valve Company, Condec's subsidiary, and a desire to sell out to Textron.

Because it is not established that the four salaried Lunkenheimer director-officers, who, along with a director attorney, constituted a majority of the Lunkenheimer board which informally approved the May 10 agreement with U. S. Industries were in fact voting for their own self interest in the form of assured employment with the buyer, the full burden of proving that the issuance of the 75,000 shares here in issue was in the corporate interest does not rest on such directors. Compare *Bennett v. Propp* (*Del.Sup.Ct.*) 187 *A.2d* 405, 409, and *Cheff v. Mathes, supra.* Nonetheless, I am persuaded on the basis of the evidence adduced at trial that the transaction here attacked unlike situations involving the purchase of stock with corporate funds was clearly unwarranted because it unjustifiably strikes at the very heart of corporate representation by causing a stockholder with an equitable right to a majority of corporate stock to have his right to a proportionate voice and influence in corporate affairs to be diminished by the simple act of an exchange of stock which brought no money into the Lunkenheimer treasury, was not connected with a stock option plan or other proper corporate purpose, and which was obviously designed for the primary purpose of reducing Condec's stock holdings in Lunkenheimer below a majority. In *McPhail v. L. S. Starrett Co.* (*C.A.* 1) 257 *F.2d* 388, in which shares were employed to defeat a takeover by a stockholder who represented an established threat to corporate existence, the Court pointed out that the plan devised to defeat such person involved the purchase of shares for employees and that "* * * to the extent such shares were issued instead of authorized but unissued shares, McPhail's relative voting position as a stockholder would not be affected, unless we make the assumption, which there is no evidence of record to support, that the optionees would vote their stock as the Company's management directed on pain of discharge." See also *Luther v. C. J. Luther Co.*, 118 *Wis.* 112, 94 *N.W.* 69.

Finally, we are not here concerned with the need of proving corporate injury as has been held to be the case when a stockholder attacks derivatively the spending of corporate funds for the purchase of his corporation's own stock, *Kors v. Carey, 39 Del.Ch.*

47, 158 *A.2d* 136. This rather is a case of a stockholder with a contractual right to assert voting control being deprived of such control by what is virtually a corporate legerdemain. ( Manipulation of this type is not permissible, *Canada Southern Oils v. Manabi Exploration Co.,* 33 *Del.Ch.* 537, 96 *A.2d* 810.

The Court has been asked by the litigants to render an opinion in this case as soon as reasonably possible despite the absence of responsive pleadings and the non-appearance of directors for the corporate defendants. Full opportunity to testify was afforded, however, and no request for a reopening of the record or for leave to file additional pleadings was made. Furthermore, the relief to be granted at this juncture is directed solely against the corporate defendants.

Accordingly, on notice, a final order will be entered cancelling the 75,000 authorized but unissued shares of Lunkenheimer stock which were issued to the defendant U. S. Industries, Inc. on May 9, 1967.