Malcolm I. GLAZER, Plaintiff,

v.

ZAPATA CORPORATION, a Delaware corporation, Ronald C. Lassiter, Thomas H. Bowersox, B. John Mackin, Jack T. Trotter, Edwin C. Broun, Michael B. Morris, and Daniel P. Whitty, Defendants.

Civ. A. No. 12958.

Court of Chancery of Delaware, New Castle County.

Submitted: May 10, 1993.
Decided: May 14, 1993.

Lawrence A. Hamermesh, Kenneth J. Nachbar, William M. Lafferty, David G. Thunhorst and Seth D. Rigrodsky, of Morris, Nichols, Arsht & Tunnell, Wilmington (Beryl Nusbaum, Harry P. Messina, Jr., Ralph K. Merzbach and Gordon E. Forth of Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY, of counsel), for plaintiff.

Charles F. Richards, Jr., Thomas A. Beck, Anne C. Foster, Michael J. Feinstein, Scott R. Haiber and Lisa A. Paolini, of Richards, Layton & Finger, Wilmington (Baker & Botts, Houston, TX, of counsel), for defendants.

ALLEN, Chancellor.

On July 21, 1992 Malcolm I. Glazer made a Schedule 13D filing with the Securities Exchange Commission disclosing that over the

course of that month he had acquired 38.8% of the voting stock of Zapata Corporation, a Delaware corporation. Prior to that time Mr. Glazer had not been a stockholder of Zapata. In his Schedule 13D filing Mr. Glazer indicated that he "had no definite plan at this time ... [but] he may seek ... acquisition of control of [Zapata]."

In February 1993, either as part of its established business plan to refinance Zapata's debt and strengthen its balance sheet, or as part of a defense to a possible election contest—the parties, of course, disagree on intention—Zapata began negotiating with Norex Drilling, Inc. a Bermudian corporation, the possible purchase by Norex of notes and stock of the Company. On April 19, 1993 the Company publicly announced that an agreement had been reached by which an affiliate of Norex would buy a package of Zapata securities, including notes, and would acquire, thereby, voting stock constituting approximately 17% of the Company voting stock.[1]

Mr. Glazer objects to the proposed Norex transaction. It is wastefully expensive capital in his opinion and its specific timing and specific terms are intended to interfere with his ability to elect nominees to the Zapata board. He instigated conversations with the investment firm Jefferies & Co. in an effort to afford Zapata an opportunity to raise a comparable amount of capital at a cheaper price, without diluting the voting power of existing shareholders. Jefferies has communicated with the Company on Mr. Glazer's behalf, asserting that cheaper capital could be found. It has not purported to offer a committed alternative, however.

The Norex transaction was scheduled to close on May 10. May 18 has been set as the record date for the firm's 1993 annual stockholder meeting. On April 29, 1993 this case was filed seeking declaratory and injunctive relief. A temporary restraining order against the closing of the Norex transaction was sought. Presently pending is a motion to enjoin the closing of the Norex transaction.

In addition to seeking to block the Norex sale, the complaint seeks relief from another condition that allegedly interferes with Mr. Glazer's ability to exercise his rights as a shareholder. This second matter concerns the effect that Glazer's acquiring or exercising control over Zapata might arguably have on the value of Zapata's principal asset: its 15.7% block of the common stock of Tidewater Industries, Inc. The complaint charges that the defendants have exploited and manipulated the existence of a Tidewater shareholders' rights plan in order to discourage and chill any shareholder vote for any directors other than themselves or those they might endorse. This is said to constitute a breach of fiduciary duty. After the case had been submitted, however, plaintiff advised that Tidewater had amended its rights plan to change the stock ownership percentage that would permit distribution of rights from 15% to 16%. Thus, plaintiff advised that his application for relief from the chilling effect on the stockholders' vote that ownership of 15.7% of Tidewater stock would have, appeared moot. I therefore do not address the interesting issue that was presented concerning that effect.

I.

Until a break in world oil and gas prices in the early 1980's Zapata was a profitable oil and gas production and service company. It was involved chiefly in the natural gas business and owned, among other assets, 12 offshore drilling rigs in the Gulf of Mexico. The Company was badly hurt by the fall in world oil and gas prices. It failed to report operating profits from 1984 through 1990. By the latter 1980's it was in strained circumstances. In 1987 it reached some agreement with its bankers but that agreement was not sufficient to permit Zapata to solve its long term problems.

1. Zapata's stock is, for the most part, not widely held. Glazer acquired most of his stake in relatively few private transactions. Three financial institutions own about 10% of the stock. Altogether, including Glazer, ten shareholders presently control about 70% of the Company's stock. Norex has owned about 4% of Zapata's stock since 1990. Management controls very little stock.

By the close of the decade Zapata's principal assets included (1) a large interest in (and management of) an off-shore oil and gas service company called Zapata Gulf Marine, (2) twelve operating drilling platforms, (3) a fishing and fish processing business, (4) some depleting gas interests in production, and (5) some miscellaneous assets.

*The 1990 Restructuring*

By 1990, Zapata's board had reached the conclusion that Zapata could not generate sufficient cash-flow from its operations to meet its very significant debt obligations under the 1987 agreement with its lenders. The board thus sought a restructuring of Zapata's debt outside of bankruptcy. This was successfully accomplished with the December 19, 1990 signing of the Master Restructuring Agreement (MRA). Under the MRA, Zapata paid its lenders $160 million in cash, (apparently received from the proceeds of the sale of its drilling platforms [2]), repaid $13 million on the Company's revolving credit facility, issued $115 million of 11% senior notes due September 30, 1997 and issued 94,480,929 shares of common stock, all in exchange for the reduction of its outstanding debt by $573 million. As a result of the MRA, Zapata's banks, who already held 10 million shares, became the owners of 83 percent of Zapata's common stock. Contemporaneously, Zapata further reduced its debt by publicly repurchasing $51.8 million of its outstanding subordinated debentures (for $26.9 million), leaving $26 million principal amount outstanding.

*Sale of Gulf Marine Corporation for Tidewater Stock*

In the fall of 1990, Zapata reached an agreement in principle, in effect, to transfer its 34.7% stake in Zapata Gulf Marine Corporation, ("Gulf Marine"), to Tidewater Industries, Inc., an energy services company, whose common stock is listed on the New York Stock Exchange. Effectuation of that transaction was accomplished in June 1991, when Gulf Marine was merged with and into Tidewater. Zapata received 8.3 million unregistered shares of Tidewater common stock in the merger, representing 15.7% of the total outstanding stock. That interest was worth roughly $125 million at that time.

This transaction presented two complications which had to be addressed through special agreements. The more important of them [3] arose from the fact that Tidewater had in place a stockholders' rights plan with a 15% trigger. Since Zapata was receiving 15.7% of Tidewater's common stock in the merger, it was necessary to amend Tidewater's poison pill to create an exemption for Zapata, insofar as it held only Tidewater stock received in the merger. This was done by amending Tidewater's rights plan to provide that as long as Zapata does not acquire any additional Tidewater stock, directly or indirectly, its ownership of stock acquired in the merger would not trigger the distribution of rights under the plan. This protection does not appear to extend, however, to any affiliates or associates of Zapata, as these terms are defined under the poison pill plan.

*Zapata's 1992 Strategic Plan*

Following the closing of the Tidewater merger, Zapata management turned to consideration of a strategic plan for the survival of Zapata. An "all hands" meeting was held in September 1991 in Houston for that purpose. The resulting business plan was presented to the Zapata board and adopted by it in October 1991. That was the Zapata 1992 Strategic Review and Business Plan. The plan noted that while Zapata had asset values sufficient to support its debt, it was generating insufficient cash flow to support required payments on that debt. The plan looked towards the further reduction of debt, the acquisition of income producing businesses in the natural gas services industry and development of Zapata's marine protein

2. A few months earlier, Zapata had sold its twelve off-shore drilling rigs to Arcthusa Limited, for $280.5 million cash and an 8% stake in that company valued at $17.5 million.

3. The other complication I refer to arose from the fact that a condition of the merger of Gulf Marine and Tidewater was that Zapata's interest in Tidewater be accounted for by the equity method. Use of the equity accounting method allows Zapata to report earnings instead of losses on its financial statements. To effectuate this, certain other major Tidewater stockholders granted Zapata voting control over an additional 4.3% of Tidewater's common stock.

(fish) operations. In the language of the 1992 Plan itself, it called for the following steps:

1. the liquidation of a significant portion of [Zapata's] investment in Tidewater to pay down existing Senior Creditor Debt.

2. The establishment of a new banking relationship to provide new financing ... to retire Senior Creditor Debt.

3. The funding of a future growth strategy through increased cash flow from existing operations, liquidation of non-strategic investments, project financing and issuance of equity.

(Mackin Aff.Ex. 1). The plan also called for the liquidation of non-core assets, such as the interest in Arethusa that Zapata had acquired in connection with the sale of its offshore platforms.

The restructuring under the 1990 MRA had substantially reduced Zapata's debt burden and the 1991 Gulf Marine merger had enhanced the liquidity of the firm's asset base. The company, continued, however, to have cash-flow challenges. It remained indebted by over $145 million[4] and was committed to make large principal payments each quarter.

*1992 Efforts to Implement the Plan*

The 1992 business plan contemplates an on-going enterprise in some aspect of the oil and gas business. But the Company's largest asset was a passive ownership stake in another firm. Thus, management from the fall of 1991 was anxious to find operating businesses in the oil and gas or affiliated industries that might prove attractive to them and that might be interested in being acquired. Zapata solicited the assistance of investment banking firms to assist it in identifying appropriate acquisition candidates. Several possibilities were explored and Zapata generally expressed an interest to pay some part of any consideration in stock. For example, at the time Mr. Glazer made his

investment the Company was pursuing an acquisition of Lantana Corp., which if it had closed would have involved the issuance of some 28.3 million Zapata shares.

Simultaneously with the search for acquisition prospects, and related to it, was a search for new sources of financing. Banks, investment advisors, investment banks, and insurance companies were contacted. Most proposals appear to have been centered around the possibility of Zapata issuing a preferred stock or debt instrument convertible into shares of the Tidewater stock owned by Zapata. These efforts may have been hampered by the fact that the Tidewater stock was relatively depressed in value at the time, and Zapata's Tidewater stock was unregistered.[5] Efforts to raise financing were also generally hampered by the fact that Zapata had not located any particular acquisition candidate. Investors willing to invest in unknown deals were not found.

*Malcolm Glazer Purchases 40% of Zapata's Stock*

As noted, the December 1990 MRA resulted in Zapata's lenders holding 83% of Zapata's stock. Many of these lenders were banks disposed to liquidate this holding. In July 1992, Malcolm Glazer, purchased 49,226,662 shares of Zapata common stock representing 38.8% of Zapata's common stock. All but 500,000 of these shares were purchased in large private transactions. The largest single purchase was of 32 million shares from a single holder on July 16, 1992. Mr. Glazer has since increased his ownership to 40.3%. The 13D plaintiff filed on July 21, 1992 described his purpose:

[Glazer] is currently evaluating his position concerning [Zapata], although he has no definitive plan at this time ... [Glazer] may seek to: obtain representation on [Zapata]'s board of directors; change [Zapata]'s present board of directors or management; change the number or term of [Zapata]'s directors; or change [Zapata]'s

---

4. By early 1992, the Company's principal assets were (1) its Tidewater common stock; (2) its fish company (Zapata Haynie Corporation, which owned a 47 vessel fleet for Menhaden fishing and processing); (3) Zapata Exploration Company ("Zapex") a small oil and gas production company which has not conducted exploration for new

reserves and therefore is a wasting asset; and (4) its interest in Arethusa.

5. While Zapata had registration rights, other holders had the right to "piggy-back" on any such registration.

charter, bylaws ... or anything else which may impede the [Glazer]'s acquisition of control of [Zapata].

(Glazer Dep.Ex. 10 at 4). Mr. Glazer paid between $0.80 to $0.96 per share.

Mr. Glazer was unknown to senior management at the time of his 13D filing. On July 27, 1992 at the invitation of Ronald Lassiter, Chief Executive Officer of Zapata, Mr. Glazer, together with one of his sons, met with Zapata's senior management in Houston for five or six hours. At that meeting a briefing covering the Company's assets and business plans was presented. The presentation and documents given to the Glazers at that time explained that the Company was considering an acquisition (the Lantana transaction) that would involve the issuance of Zapata common stock and that Mr. Glazer could expect that his proportionate interest in the Company would be diluted from 38.8% to 30.8%, as a result of the closing of that transaction.

On July 28, 1992, John P. Laborde, the CEO of Tidewater, sent a letter to the members of his board. In that letter Mr. Laborde expressed concern about Glazer accumulating Zapata stock. As a result of the Tidewater–Gulf Marine merger the three former owners of Gulf Marine (Zapata, Corporate Partners and Bessemer Capital Partners) together hold 40% of Tidewater stock and Zapata appears to control the vote of half of that stock. Any CEO would be very interested, and appropriately so, in the implications for his or her company of any prospect of a change in control of such a shareholder. In his letter to the Tidewater board, Laborde stated that were Glazer to purchase more than 50% of Zapata's common stock, Zapata could be considered Glazer's affiliate. It was suggested that the "carve out" for Zapata's 15.7% ownership in Tidewater's shareholders' rights plan would not apply to Glazer as the indirect owner of 15.7% through Zapata. On August 5, 1992, an attorney from Tidewater sent a letter to Lassiter stating that "on the basis of Mr. Glazer's

SEC filings, Tidewater is concerned that he is treading very close to the line under Tidewater's Rights Agreement [poison pill]." (Glazer Dep.Ex. 6).

Zapata management viewed the threat of the Tidewater pill as an impediment to any further action by Glazer. The minutes of Zapata's August 13, 1992 board of director's meeting state that:

> The Chairman advised that the provisions of the Tidewater Rights Agreement would apparently preserve the status quo for some period of time, since any additional purchases by Mr. Glazer, or his being accorded one or more seats on the Board of Directors might be deemed to constitute control of the Company, and thus a triggering event under that Agreement.

(Mackin Dep.Ex. 6 at 5).[6]

Following the August 13 meeting, Lassiter and John Mackin, a former CEO and present director of Zapata, traveled to New Orleans to meet with Mr. Laborde and other members of Tidewater management. There is testimony that at the meeting, Mr. Mackin took the position that the pill had not yet been triggered, but that Laborde would not commit to any position on that subject.

### Standstill Agreement Negotiations

Throughout the period August 1992 through November 1992, Zapata, Tidewater and Glazer engaged in a series of negotiations looking towards a standstill agreement. From Tidewater's perspective this involved raising the spectre of a present or future declaration by it that Glazer's acquisition of Zapata shares, or his nomination of one or more Zapata directors, constituted a triggering event. It sought as much protection as it could get from the prospect of Mr. Glazer gaining influence over it or control over its important stockholder. From Zapata's position it of course wanted agreement that no triggering event had occurred and wished to assure that none would. But more importantly, it is obvious that the board sought as

---

6. According to the testimony of Mr. Sinders, an investment banker with Jefferies & Co., Zapata management informed him at the time that Glazer purchased his Zapata shares, that because of the Glazer's investment, Zapata would not pur-

sue any transactions which involved reducing Zapata's stake in Tidewater below the 15% level at which the Tidewater pill would be triggered. (Sinders Dep. at 68). That assertion is denied.

well to deploy the *in terrorem* effect of the Tidewater pill as a way to discourage Glazer from seeking, or receiving the support necessary to achieve, the proportionate board representation that he sought. From Glazer's point of view an agreement with Tidewater was one way to defuse the risk that the Tidewater pill posed to his acquisition of further Zapata stock or to his gathering of election support from other shareholders.

Those negotiations are complex and do not relate directly to the Norex transaction. The Norex transaction arises as a possibility in January and was negotiated in February, after Glazer's effort to negotiate an agreement with Tidewater failed. Tidewater and Zapata did reach an agreement in November 1992. That agreement committed Tidewater to amend its rights plan to provide that Glazer's acquisition of 51,976,923 shares of Zapata is not "a Trigger Event under the Rights Agreement" and committed Tidewater not to thereafter "make any public announcement that Glazer has become an Acquiring Person" so long as Mr. Glazer refrains from a long list of things relating to the corporate governance of Zapata, including seeking to elect or nominating more than one director of the Company or seeking to remove any current Zapata director. Glazer, however, was not a party to that agreement.

*Continued Effort to Implement Business Plan*

The effort to implement the business plan appears to have continued through this period. The Lantana deal which was alive in July, was abandoned in August. In the fall a possible acquisition of Holt Companies Energy Group, Inc. ("Holt") became the subject of conversations and negotiations. Holt is a company engaged in the marketing of natural gas compressors for use in field compression of natural gas. Mr. Lassiter testified that an oral agreement in principle was reached with Holt in January 1993. The deal called for cash and Zapata stock.

Also in January 1993, Lassiter met with Mr. Kristian Siem, a principal of Norex. Norex had been a holder of Zapata stock and debt since 1990. The Siem and Lassiter meeting had been a usual occurrence once or twice a year since Norex had acquired its interest. According to Lassiter, he told Siem at that 1993 meeting that he was considering a refinancing of Zapata and an acquisition of Holt, but that he was having difficulty securing financing. According to his own testimony, Siem then stated that Norex had a substantial amount of cash available and it would consider financing the Holt transaction.

In early February Glazer filed an amended Schedule 13D stating that he presently intended to nominate a slate of three directors to fill the three vacancies that would be elected in Zapata's staggered board at the 1993 annual meeting, which could be expected to be held in June.

On February 19, 1993 Lassiter and other Zapata representatives traveled to France to meet with Norex representatives. After two days of negotiations the basic terms of a transaction were reached. On March 4, 1993 Norex and Zapata signed a commitment letter. Under the final Norex Agreement, Zapata is to sell to Norex the following: (1) $50,000,000 principal amount of Secured Notes, bearing 13% interest and maturing in three years; (2) $32,625,000 principal amount of Senior Convertible Notes also bearing 13% interest and maturing in three years; (3) 17,500,000 shares of Preferred Stock for $1.00 per share, bearing an 8.5% dividend and convertible into 1 share of Tidewater common stock for 26 preferred shares; (4) 15 million shares of Zapata common stock for $0.75 per share. To secure repayment of the notes Norex will have a first lien on all property of Zapata. The transaction, however, contemplates the sale of 3,458,220 of Zapata's Tidewater shares for the purpose of consummating the Holt transaction which is tentatively scheduled to close on June 30, 1993.

A week after the Norex commitment was signed, Zapata signed a commitment letter with Holt. That letter contemplated a price of $74 million cash and up to 13.5 million Zapata shares. A final contract has not yet been signed.

*Consideration of the Norex Transaction*

The proposed Norex transaction was presented to the board at a special meeting on March 26, 1993. The presentation included

management's opinion that it would be very difficult to obtain an alternative transaction and that the previous search for financing demonstrated that traditional commercial lenders were not interested in investing in Zapata in its present circumstances. Simmons & Company ("Simmons"), an investment banking firm specializing in the oil and gas industry, had been retained to provide an opinion on the fairness of the Norex transaction. Simmons' fee for this fairness opinion is contingent upon the transaction closing. Thus it is not disinterested in the board's decision.

On April 13, 1993 the Zapata board met again and after considering the Norex transaction, the Holt acquisition, and the Simmons opinion that the transaction was fair, voted to approve the Norex transaction.

*Glazer Proposes An Alternative Refinancing Transaction*

After he learned of the Norex transaction on April 16, 1993, Mr. Glazer retained Jefferies & Company, an investment banking firm, and requested that Jefferies formulate an alternative proposal for the financing of Zapata. Jefferies valued the package of securities to be sold to Norex for $111.4 million as having a market value of $125.6 to $133.7 million. It suggested as an alternative the issuance of: (1) $75 million in Senior Secured debt bearing interest at a range of 9.75 to 10.25% and having an average maturity of 8.5 years; (2) Preferred Stock paying dividends of between 6.75% and 7.25%, convertible to one share of Tidewater stock for each 27.06 preferred shares; and (3) 15 million shares of common stock for $1.00 per share or $15 million. The debt and preferred stock would be sold in public offerings, while the common stock would be purchased by Glazer (although an offering of pre-emptive rights to existing shareholders would apparently be acceptable to plaintiff).

The refinancing package proposed by Jefferies would, if achievable, initially at least, be significantly less expensive than the Norex transaction. The debt which Jefferies proposes to sell in a public offering has a lower interest rate and longer maturity than the debt Norex proposes to buy. The preferred stock Jefferies proposes to have Zapata issue in a public offering has a lower dividend rate and is convertible into slightly fewer Tidewater shares, than the preferred stock to be sold to Norex. Finally, Jefferies proposes that Zapata sell to the Glazers the same number of common shares that Norex plans to purchase, but at $1.00 per share (in total, $3.75 million more) instead of the $0.75 per share Norex would pay.

The Jefferies proposal is not the strict equivalent of the Norex transaction and has several disadvantages: (1) the Jefferies proposal contemplates the sale of Zapata debt and preferred stock securities in a public offering, the feasibility of which is unclear if not doubtful; (2) it is unclear whether a public offering could be concluded quickly enough to close the Holt transaction as scheduled on June 30, 1993; (3) sale of the 15 million common stock shares to Glazer would involve granting him a controlling or very near controlling block of Zapata's stock; (4) most importantly, the Norex transaction is a fully committed deal, while the Jefferies alternative is a proposal for which Jefferies was unable to give a "highly confident" letter, let alone a form of assurance against which the Company might have legal recourse.

On April 30, 1993, one day after Glazer filed this action, the Zapata board met to consider the relative merits of the Norex and Jefferies transactions. The board decided to continue to pursue the Norex transaction.

## II.

It is thoroughly established that in order to prevail on a motion for a preliminary injunction:

> the plaintiff must demonstrate a reasonable probability of success on the merits and that irreparable harm will occur absent the injunction. Additionally the plaintiff must show that the harm it would suffer absent an injunction outweighs the harm to the defendant if relief is granted.

*Allen v. Prime Computer, Inc.,* Del.Supr., 540 A.2d 417, 419 (1988); *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1341 (1987). In this instance I cannot conclude that there exists a reason-

able probability of success on plaintiff's claim that the Norex transaction is intended primarily to impede or affect a forthcoming election contest or is otherwise wrongful.

### III.

The Norex transaction is attacked on two bases primarily. First it is said to be a bad deal; the price paid both in terms of interest and equity dilution is said to be substantially more than alternative market transactions would offer. Plaintiff has offered affidavit testimony to support this view. The alleged generousness of the terms of the financing (from Norex's point of view) is said by plaintiff to have another and greater significance relating to the second argument in favor of the injunction sought. The second basis is that the Norex transaction (and most pointedly the inclusion of a present equity component in it) was designed primarily for an inequitable purpose: the dilution of Mr. Glazer's voting power in the face of his challenge to the incumbent directors.

### A.

■ As to the first theory, that the transaction is wasteful, the legal test is severe. Directors are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration. If reasonable, informed minds might disagree on the question, then in order to preserve the wide domain over which knowledgeable business judgment may safely act, a reviewing court will not attempt to itself evaluate the wisdom of the bargain or the adequacy of the consideration. *See Grobow v. Perot*, Del.Supr., 539 A.2d 180, 189 (1988); *Saxe v. Brady*, Del.Ch., 184 A.2d 602 (1962). It is not likely that this test will be satisfied in this case on a final hearing.

■ It is significant that Zapata has been unable to find a lender willing to extend substantial new credit to it nor has it been able to arrange a mutually agreeable stock acquisition of a substantial enterprise. The views of Jefferies & Co. might prove correct in time or they may prove to be unduly optimistic. Jefferies has not committed in a way that would give assurance that it could put a cheaper equivalent package of financing in place. Thus, the court is left with a difference in business judgment.

### B.

■ The alleged inadequacy of the terms of the Norex contract are said by plaintiff to have another significance (beyond that of a waste claim). Those terms evidence the fact, it is said, that the defendants are not primarily interested in achieving the best, most economical debt restructuring for Zapata, but are primarily motivated to place voting securities into friendly hands in order to dilute Mr. Glazer's voting power and preserve their own endangered offices. Thus, plaintiff asserts that the board's judgment is entitled to no deference because the Norex transaction is a defensive response to Mr. Glazer's acquisition of a 40% block of Zapata stock and his announced intention to possibly seek to elect three directors.

Mr. Glazer asserts that this transaction is defensive; it protects the incumbent directors in office and must satisfy the test announced in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985). Thus he says the board must demonstrate that Glazer's acquisition of stock and intention to possibly run a slate of directors at the next annual meeting constitutes a threat to the corporation and that its dilution of his voting power is a reasonable response to that threat in the circumstances. But plaintiff asserts that defendants can make no such showing because the prospect of a stockholder exercising the proportionate power to elect directors that the certificate of incorporation confers upon him cannot constitute a legally cognizable threat to the corporation. *See Blasius Industries, Inc. v. Atlas Corp.*, Del.Ch., 564 A.2d 651 (1988). Thus, plaintiff says the Norex transaction cannot meet the modified business judgment test of *Unocal* and must be seen as an inequitable deployment of directorial power.

For purposes of this preliminary injunction application, I cannot accept that the Norex transaction should be reviewed under the *Unocal* test. That is, I do not accept at this

stage that that transaction is motivated solely, primarily or even substantially as a defensive transaction. A preliminary assessment of the record suggests that the Norex transaction is an important step in realizing the business plan that the board had developed prior to Mr. Glazer's arrival on the scene.

In part, the terms of the transaction itself are supportive of that tentative conclusion. They do not tend to suggest that a third party (Norex) has been specially accommodated in order to employ that party as a secure, management-controlled source of voting power. *Compare Shamrock Holdings v. Polaroid,* Del.Ch., C.A. No. 10582, 1989 WL 7033, Berger, V.C. (Jan. 31, 1989), 559 A.2d 278, 1989 Fed.Sec.L.Rep. ¶ 94,340 at 92,217 (1989) (agreement substantially limiting exercise of vote-related rights of holder of preferred). Most importantly neither the incumbent Zapata directors nor the corporation itself will in any respect control how the new stock is voted; nor does Norex covenant not to vote against incumbents or proposals they endorse, or not to run a proxy contest or be part of a group for that purpose.[7] Thus in every formal way the shares to be issued to Norex will be as free as are any public shares to vote in whatever way the holder believes will be most likely to increase the net value of his or her investment in Zapata.

Nor does the record give grounds to suspect that the issuance of this stock will be entrenching because of social facts that may run deeper (and be less observable than) formal legal rights and duties. The record, at this stage is most suggestive of an entirely appropriate and open relationship between Mr. Siem, a principal in Norex, and Mr. Lassiter. Siem has a long but shallow business acquaintance with Lassiter. He caused Norex to become a shareholder and debt holder of Zapata in 1990. When he then sought membership on the Zapata board he was twice rebuffed. Thus, there appears to be no grounds to see Norex as an accommodation party whose vote as a stockholder will

be affected by anything other than its economic interest as a creditor and owner.

That the transaction when accomplished will dilute the voting power of Mr. Glazer is not legally significant on the facts as they appear at this stage. The cases in which this court has found the issuance of shares that dilute control as constituting a violation of an equitable duty are distinguishable from this case as it now appears: *Condec Corp. v. Lunkenheimer Co.,* Del.Ch., 230 A.2d 769 (1967); *Canada Southern Oils, Ltd. v. Manabi Exploration Co.,* Del.Ch., 96 A.2d 810 (1953) and *Packer v. Yampol,* Del.Ch., C.A. No. 8432, 1986 WL 4748, Jacobs, V.C. (April 18, 1986). Plaintiff argues that these cases:

> "demonstrate [that] this court will not sustain a stock issuance, even one with a purported business justification, if it finds that the issuance will perpetuate the incumbent directors' control."

(Plaintiff's Br. at 58–59).

On this record it is entirely unclear how long the incumbent board will be "perpetuated" in office if the Norex (and Holt) transactions are accomplished. It rather depends, one supposes, on the Company's financial performance in the not too distant future. But putting that speculation aside and assuming with plaintiff that closing of the Norex transaction will have the effect of "perpetuating" control in the incumbents at least for a period, nevertheless such an *effect* does not itself provide a ground to invalidate board action; rather it is the purpose that motivates the board to take action having that effect that is critical.

In *Condec,* the Lunkenheimer Company, rejected Condec's offer of a merger, and when Condec then sought to begin acquiring its shares, Lunkenheimer entered into a contract for the sale of substantially all of its assets to Textron, Inc. Condec responded by extending a tender offer for (51%) of Lunkenheimer's common stock which it closed before the shareholders' meeting could be held to vote on the Textron sale. The day of the stockholder's meeting Lunkenheimer entered a second asset sale agreement, this

---

**7.** *Cf. Abajian v. Kennedy,* Del.Ch., C.A. No. 11425, 1992 WL 8794, Allen, C. (Jan. 17, 1992) (restriction on voting rights of preferred provide

ground to excuse demand under Rule 23.1); *Good v. Texaco,* 1984 WL 8220 (Del.Ch.) (*id.*).

one with U.S. Industries ("USI"). The prior day it had entered a stock purchase agreement pursuant to which it issued 75,000 shares of Lunkenheimer stock to USI in return for preferred stock of USI. USI sought to vote its Lunkenheimer stock in favor of the asset sale. Condec sought to enjoin that vote.

The court rejected Lunkenheimer's claim that it had issued the common stock in order to preserve Lunkenheimer's corporate existence for tax purposes. The court stated:

> In view of the haste with which the basic Lunkenheimer–U.S. Industries transaction was hammered out ... followed up by a decision to have Lunkenheimer issue 75,-000 new shares, when a substantially smaller number would have served the purpose of preserving Lunkenheimer as a corporate entity, *I have reached the conclusion that the primary purpose of the issuance of such shares was to prevent control of Lunkenheimer from passing to Condec and to cause such control to pass into the hands of U.S. Industries.*

*Condec,* 230 A.2d at 775. (emphasis added). The court ordered that the 75,000 shares issued be canceled explaining that:

> the transaction here attacked ... was clearly unwarranted because it unjustifiably strikes at the very heart of corporate representation by causing a stockholder with an equitable right to a majority of corporate stock to have his right to a proportionate voice and influence in corporate affairs to be diminished by the simple act of an *exchange of stock which brought no money into the Lunkenheimer treasury ... and which was obviously designed for the primary purpose of reducing Condec's stock holdings in Lunkenheimer below a majority.*

*Condec* at 777. (emphasis added).

*Canada Southern Oils* involved a dispute between the president and large minority stockholder of Manabi Exploration Co., a Mr. Hagan, and Manabi's majority stockholders, the "Buckley interests", regarding the proper resolution of Manabi's financial difficulties.

Hagan sent a telegram to the Buckley representatives in New York on March 23, 1953, calling a board meeting of the Manabi Company on March 27 in Houston, Texas. Hagan rejected requests for a few days delay. The meeting was attended exclusively by directors sympathetic to Hagan. The board voted to issue 226,950 shares of Manabi common stock, 26,950 of which were sold to the attending board members and 200,000 of which were sold through an underwriter primarily to two large buyers. On the record it was reasonable to infer that Hagan had arranged the purchase of the shares before he called the board meeting.

Hagan claimed that the shares were issued to raise money "to meet defendant's dire financial plight" but conceded that "if the primary purpose of the sale was to deprive plaintiff of its voting position then the action was improper." *Id.* at 813. The court considered the circumstances surrounding the issuance of the shares and held that:

> when the undisputed facts are viewed cumulatively I find it reasonable to infer that the primary purpose behind the sale of these shares was to deprive plaintiff of the majority voting control. Hagan and his associates did too much too soon with too little disclosure to justify a contrary conclusion.

*Canada Southern Oils,* 96 A.2d at 813. The Chancellor granted a preliminary injunction against the issuance, transfer and voting of the shares.

In *Packer v. Yampol,* management sought to defeat a proxy contest launched by outside investors by issuing to the founder and President, Mr. Yampol and to entities allied with Yampol, super-voting preferred stock, which held 33% of the total voting power of the company. The issuance of the preferred stock gave Yampol control of 44% of the voting power of the company. The super-voting preferred was also given a right to veto major transactions such as mergers and asset sales. The defendants paid only $0.86 per vote at a time when the common stock was selling for $8.75 per share. *Packer* at *8–9. This court rejected defendants' claims that the preferred stock was issued to Yampol and his allies because the company needed to raise capital and they were the only interested investors. The court held that

[w]hile raising capital may have been a purpose for the directors' conduct *their primary purpose was to obstruct plaintiffs' ability to wage a meaningful proxy contest in order to maintain themselves in control,*

*Id.* at *15. (emphasis added). A preliminary injunction against the voting of the preferred share was issued.

These cases stand for the proposition that directors may not act to frustrate the efforts of stockholders to elect new directors by engaging in transactions that are designed and pursued for the primary purpose of diluting the votes held by the insurgent stockholders. As such they are articulations of the principle which was old and well established when articulated in *Schnell v. Chris–Craft Industries,* Del.Supr., 285 A.2d 437 (1971) that "the subversion of corporate democracy by manipulation of corporate machinery will not be countenanced under Delaware law." *Moran v. Household Internat'l, Inc.,* Del.Ch., 490 A.2d 1059, 1080 (1985). *See also Blasius, supra; Aprahamian v. HBO & Co.,* Del.Ch., 531 A.2d 1204 (1987).

That principle does not however, require that management refrain from issuing voting securities, and thereby diluting the voting strength of insurgent stockholders, during the pendency of a proxy contest, when the issuance legitimately has a primary purpose directed to the management of the corporation and its business. Thus, like most equity cases, resolution of issues of this sort are typically highly particularized; factual. The Norex transaction, unlike the stock issuances enjoined in the above cases, is the outgrowth of a long-term plan pursued by management for more than a year, of obtaining new capital for Zapata. Its terms are supportive of that purpose, not of a masked corporate control purpose. The record does not support the conclusion at this time that the sole or primary purpose of the Norex transaction is to dilute Glazer's stake in Zapata and thereby defeat his efforts to elect three nominees to the Zapata board. Therefore, Glazer's request for a preliminary injunction prohibiting the consummation of the Norex transaction will be denied.