# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JEFFREY I. TILDEN, derivatively on behalf of Blucora, Inc.,

   Plaintiff,

  v.

JOHN E. CUNNINGHAM, IV; DAVID H.S. CHUNG; LANCE DUNN; STEVEN W. HOOPER; ELIZABETH J. HUEBNER; ANDREW M. SNYDER; CHRISTOPHER WALTERS; MARY ZAPPONE; WILLIAM J. RUCKELSHAUS; GEORGE ALLEN; GCA ADVISORS, LLC, a Delaware Limited Liability Company (known at all relevant times as GCA SAVVIAN ADVISORS, LLC); and CAMBRIDGE INFORMATION GROUP, INC., a Maryland corporation, and its wholly owned and controlled subsidiary, CAMBRIDGE INFORMATION GROUP I LLC, a Delaware limited liability company,

   Defendants,

  and

BLUCORA, INC., a Delaware corporation,

   Nominal Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**C.A. No. 2017-0837-JRS**

## MEMORANDUM OPINION

Date Submitted:  July 11, 2018
Date Decided:  October 26, 2018

Chad J. Toms, Esquire and Kaan Ekiner, Esquire of Whiteford, Taylor & Preston LLC, Wilmington, Delaware; Ian S. Birk, Esquire of Keller Rodrback, L.L.P., Seattle, Washington; Chelsey L. Mam, Esquire and David M. Simmonds, Esquire of Gordon Tilden Thomas & Cordell, Seattle, Washington, Attorneys for Plaintiff Jeffrey I. Tilden.

A. Thompson Bayliss, Esquire, Michael A. Barlow, Esquire and Daniel J. McBride, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware and Daniel J. Dunne, Esquire of Orrick, Herrington & Sutcliffe LLP, Seattle, Washington, Attorneys for Defendants John E. Cunningham, IV, David H.S. Chung, Lance Dunn, Steve W. Hooper, Elizabeth J. Huebner, Christopher Walters, and Mary Zappone.

D. McKinley Measley, Esquire and Lauren Neal Bennett, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Christopher B. Durbin, Esquire and Jeff Lombard, of Cooley LLP, Seattle, Washington, Attorneys for Defendant William J. Ruckelshaus.

Rudolf Koch, Esquire and Diana M. Joskowicz, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Paul H. Beattie, Esquire of Rimon P.C., Seattle, Washington, Attorneys for Defendant GCA Advisors, LLC.

Garrett B. Moritz, Esquire and R. Garrett Rice, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and Peter L. Simmons, Esquire and Michael P. Sternheim, Esquire of Fried, Frank, Harris, Shriver & Jacobson LLP, New York, New York, Attorneys for Defendants Cambridge Information Group, Inc., Cambridge Information Group I, LLC, Andrew M. Snyder and George Allen.

Bradley D. Sorrels, Esquire, Lori W. Will, Esquire and Andrew D. Berni, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Wilmington, Delaware and Barry M. Kaplan, Esquire and Gregory L. Watts, Esquire of Wilson Sonsini Goodrich & Rosati, P.C., Seattle, Washington, Attorneys for Nominal Defendant Blucora, Inc.

**SLIGHTS, Vice Chancellor**

Ignoring a Delaware forum selection clause in the bylaws of the Delaware company whose interests he purports to represent, the plaintiff in this stockholder derivative action has adopted an ill-fated "anywhere but Delaware" litigation strategy. As either attorney or named plaintiff, he filed derivative claims against certain directors of the Nominal Defendant, Blucora, Inc., first in the Superior Court of King County, Washington, and then, in expanded form, in the Superior Court of California in San Francisco. Both courts pointed to the forum selection bylaw and determined that Plaintiff's case belonged in Delaware. Apparently wanting to avoid the third strike, Plaintiff has finally landed here—where he should have been all along—bringing the same claims he unsuccessfully attempted to prosecute elsewhere.

Plaintiff challenges three unrelated transactions authorized by Blucora's board of directors (the "Board") at various times beginning in 2013 through 2015: two separate Blucora acquisitions (the so-called "Monoprice" and "HD Vest" transactions) and certain Blucora stock repurchases that allegedly facilitated favorable stock trades by Blucora insiders. As for the acquisitions, Plaintiff contends that the Board members in place at the time of the transactions violated their fiduciary duties by failing to heed clear indicators that the transactions were overpriced and would fail to deliver any value for the Company. While Plaintiff now seeks to recast his Monoprice and HD Vest claims, even a cursory review of

1

the operative pleading reveals that these derivative claims are pled as failures of oversight, "possibly the most difficult theory in corporation law upon which [he] might hope to win a judgment."[1] As for the claims relating to Blucora's stock repurchases, Plaintiff couches these transactions as corporate waste and then invokes the seminal *Brophy v. Cities Serv. Co.*[2] to allege that certain Blucora insiders breached their fiduciary duties by exploiting nonpublic information when trading Blucora stock in the wake of the wasteful repurchases. These claims, also derivative, require well-pled facts that allow a reasonable inference of intentional misconduct.

Against this backdrop, the specific claims raised in the Verified Derivative First Amended Complaint (the "FAC")[3] comprise six counts:

- Count I, against Director Defendants John Cunningham, David Chung, Lance Dunn, Steven Hooper, Elizabeth Huebner, Andrew Snyder, Christopher Walters, Mary Zappone and William Ruckelshaus "for monetary damage and other injury to Blucora resulting from their breaches of the duty of loyalty in connection with the Company's [October 13, 2015] acquisition of HD Vest"[4];

---

[1] *Stone ex. rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996)).

[2] *Brophy v. Cities Serv. Co.*, 70 A.2d 5 (Del. Ch. 1949).

[3] D.I. 2.

[4] FAC ¶ 142.

- Count II, against GCA Advisors, LLC ("GCA")[5] "for monetary damage and other injury to Blucora resulting from . . . GCA's aiding and abetting the breach of fiduciary duties by [Director Defendants] Cunningham, Chung, Dunn, Hooper, Huebner, Snyder, Walters, Zappone and Ruckelshaus in connection with the Company's [October 13, 2015] acquisition of HD Vest"[6];

- Count III, against Director Defendants Andrew Snyder, John Cunningham, Elizabeth Huebner, Steven Hooper, David Chung, Lance Dunn and William Ruckelshaus "for monetary damage and other injury to Blucora resulting from their breaches of the duty of loyalty"[7] by disregarding "observable red flags"[8] "in connection with the Company's [August 22, 2013] acquisition of Monoprice"[9];

- Count IV, against Director Defendants Andrew Snyder, John Cunningham, David Chung, Lance Dunn, Steven Hooper, Elizabeth Huebner and William Ruckelshaus "for monetary damage and other injury to Blucora resulting from their breaches of the duty of loyalty in connection with the Company's share repurchases in December 2013 and throughout 2014,"[10] and [Director Defendant] Christopher Walters "for monetary damage and other injury to Blucora resulting from his breach of the duty of loyalty in connection with the Company's share repurchases from May 13, 2014 through December 2014"[11];

---

[5] GCA was known at all relevant times as "GCA Savvian Advisors, LLC." FAC ¶ 12.

[6] FAC ¶ 144.

[7] FAC ¶ 147.

[8] FAC ¶ 57.

[9] FAC ¶ 147.

[10] FAC ¶ 149.

[11] FAC ¶ 150.

3

- Count V, against Director Defendant Andrew Snyder, his two companies, Cambridge Information Group, Inc. ("CIG") and Cambridge Information Group I, LLC ("CIG I"), and Defendant George Allen "for the full amounts of ill-gotten gains obtained through sales of Blucora shares while in possession of material nonpublic information" from November 2013 through January 2014[12]; and

- Count VI, where the plaintiff seeks "[t]he imposition . . . of substantive and verifiable corporate governance reforms" on Blucora.[13]

Defendants have moved to dismiss the FAC on the grounds that Plaintiff has failed to plead demand futility under Court of Chancery Rule 23.1 and failed to state viable claims under Court of Chancery Rule 12(b)(6).[14] I agree on both fronts. Plaintiff has failed to plead particularized facts to raise a reasonable doubt that a majority of the members of the Board in place when he filed the FAC (the "Demand Board") could have impartially exercised their business judgment when considering a pre-suit demand.[15] Even if he had pled demand futility, Plaintiff has failed to state

---

[12] FAC ¶¶ 68, 152.

[13] FAC ¶ 154.

[14] *See* Def. Blucora's Mot. to Dismiss (D.I. 26); Def. GCA's Mot. to Dismiss (D.I. 29); Director Defs.' Mot. to Dismiss the FAC (D.I. 33); Defs. CIG, Snyder and Allen's Mot. to Dismiss Count V (D.I. 34). Certain Defendants also filed a Motion to Disqualify Plaintiff as the shareholder representative. *See* Certain Defs.' Mot. to Disqualify Tilden as Representative Pl. ("Mot. to Disqualify Tilden") (D.I. 31). For reasons explained below, I need not and decline to decide that Motion.

[15] *Harris v. Carter*, 582 A.2d 222, 228 (Del. Ch. 1990) (Allen, C.) (holding that demand futility is determined by an assessment of the board as comprised at the time the complaint is filed).

4

claims upon which relief may be granted. Several of the claims are barred by laches. Even if timely, the claims fail on the merits, either because the FAC fails to plead a viable oversight claim or because the claims cannot pass through the Section 102(b)(7) exculpatory provision in Blucora's certificate of incorporation.[16] As for the aiding and abetting claim against GCA, that fails because the underlying breach of fiduciary duty claims fail. Accordingly, the Motions to Dismiss must be granted.

## I. BACKGROUND

I draw the facts from the allegations in the FAC, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[17] In resolving the four Motions to Dismiss, I have accepted as true the FAC's well-pled factual allegations and have drawn all reasonable inferences in Plaintiff's favor.

---

[16] 8 *Del. C.* § 102(b)(7).

[17] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine). *See also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (noting that where, as here, the nominal defendant has produced documents in response to a demand for books and records under 8 *Del. C.* § 220 on the condition that such documents be deemed incorporated by reference in any complaint that might later be filed, it was appropriate for the court to consider the documents in their entirety as opposed to only the portions "cherry-picked" by the plaintiff).

## A. The Parties and Relevant Non-Parties

As noted, Plaintiff challenges three discrete transactions approved by three different compositions of the Board. The FAC individually names nine former and current members of the Board (the "Director Defendants"). Of the nine Director Defendants, only three served on the Demand Board. Given the importance of these distinctions to the demand futility analysis, I specify which of the individual defendants have been named in which count(s) of the FAC and set the Demand Board apart from the other Director Defendants.

### 1. The Plaintiff

Plaintiff, Jeffrey Tilden, has been a Blucora shareholder at all times relevant to the FAC.[18] He alleges he is an attorney and named partner at Gordon Tilden Thomas & Cordell LLP, one of the law firms representing him in this action.[19] He also alleges "[h]e is serving as the representative plaintiff in order to protect the claims asserted herein from even arguable statute of limitations defenses."[20]

---

[18] FAC ¶ 1; Opening Br. in Supp. of Nominal Def. Blucora, Inc.'s Mot. to Dismiss Pursuant to R. 23.1 ("Def. Blucora's Opening Br.") 5.

[19] FAC ¶ 96.

[20] *Id.* These allegations serve as the basis for certain Defendants' Motion to Disqualify Tilden as both shareholder plaintiff representative and non-Delaware counsel. Those Defendants correctly argue that allowing a shareholder plaintiff to prosecute a derivative action when that plaintiff is affiliated as partner with the law firm purporting to act as plaintiff's lead counsel violates "[t]he prohibition against a plaintiff class representative serving as counsel for the class. . . ." *Abrams v. Sachnoff & Weaver, Ltd.*, 2007 WL 1017356, at *4 (Del. Apr. 4, 2007) (TABLE). *See* Del. Lawyers' R. Prof'l

6

According to his lawyers, Plaintiff will step aside to make room for another representative plaintiff as soon as a Blucora stockholder willing to assume that role comes forward.

## 2. The Entity Defendants

Nominal Defendant, Blucora, is a publicly traded Delaware corporation headquartered in Irving, Texas.[21] Blucora operated an e-commerce business through 2016 and an internet search and content business until 2017.[22] Blucora now provides technology-enabled financial solutions through tax preparation and wealth management businesses.[23]

---

Conduct 1.7(a) ("a lawyer shall not represent a client if the representation involves a conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer."); *In re Fuqua Indus., Inc. S'holder Litig.*, 2006 WL 2640967, at *8 (Del. Ch. Sept. 7, 2006) ("There is an inherent conflict of interest when one person serves simultaneously as class representative and as attorney for the class.") (quoting *Goodrich v. E.F. Hutton Gp., Inc.*, 1993 WL 94456, at *2 (Del. Ch. Mar. 24, 1993) (in turn citing *Emerald P'rs v. Berlin*, 564 A.2d 670, 676–80 (Del. Ch. 1989))). While there is no doubt that Tilden's role as representative counsel and representative plaintiff presents a disqualifying conflict under Delaware law, I need not adjudicate the conflict or the Motion to Disqualify because I am satisfied that the FAC must be dismissed with prejudice.

[21] FAC ¶ 14.

[22] Def. Blucora's Opening Br. 3.

[23] *Id.*

7

Defendant, GCA, is a Delaware limited liability company that Blucora retained as its financial advisor to identify acquisition opportunities.[24] GCA advised the Company on the HD Vest acquisition and ultimately delivered a fairness opinion that endorsed the transaction.[25]

Defendant, CIG, is a Maryland corporation; Defendant, CIG I, is a Delaware limited liability company. "CIG, directly or through CIG I, became a shareholder of Blucora in 2010 or 2011."[26] A stockholder agreement between Blucora and CIG granted CIG the right to designate an "Investor Representative" to serve as a member of the Blucora Board.

### 3. The Director Defendants, Non-Party Directors and Non-Director Individual Defendant

Director Defendant, Andrew Snyder, served as CIG's Board designee from August 2011 through May 25, 2017.[27] He served as Chairman of Blucora's Mergers & Acquisitions Committee ("M&A Committee") from August 2013 until its dissolution in June 2016. Plaintiff alleges Snyder failed to fulfill his director oversight duties in bad faith by approving the HD Vest (Count I) and Monoprice

---

[24] FAC ¶ 12.

[25] FAC ¶ 36.

[26] FAC ¶ 13.

[27] FAC ¶¶ 7, 13.

(Count III) acquisitions, breached his fiduciary duty of loyalty in connection with the share repurchases (Count IV)[28] and engaged in insider trading in the midst of the challenged share repurchases (Count V).[29]

Director Defendant, John Cunningham, served on the Board from July 1998 until February 28, 2017.[30] Cunningham became Chairman of the Board in January 2011.[31] He is named in Counts I (HD Vest), III (Monoprice) and IV (share repurchases).

Director Defendant, William Ruckelshaus, served on the Board from May 2007 until March 31, 2016.[32] He also served as the Company's President and Chief Executive Officer beginning in November 2010.[33] He is named in Counts I (HD Vest), III (Monoprice) and IV (share repurchases).

Director Defendant, David Chung, served on the Board from May 2013 through February 28, 2017.[34] Director Defendant, Steven Hooper, served on the

---

[28] *See* FAC ¶¶ 142, 147, 149.

[29] FAC ¶¶ 68, 152.

[30] FAC ¶ 2.

[31] *Id.*

[32] FAC ¶ 10.

[33] *Id.*

[34] FAC ¶ 3.

Board from April 2011 until June 1, 2017.[35]  And Director Defendant, Elizabeth Huebner, served on the Board from May 2009 through August 10, 2017.[36]  Each are named in Counts I (HD Vest), III (Monoprice) and IV (share repurchases).

**The Demand Board:**

Director Defendant, Lance Dunn, has served on the Board since August 2012.[37]  At all times relevant to Plaintiff's allegations, Dunn served as a member of the Board's Audit and Nominating and Corporate Governance committees.[38]  He is named in Counts I (HD Vest), III (Monoprice) and IV (share repurchases).

Director Defendant, Christopher Walters, has served on the Board since May 2014.[39]  He has been a member of the Board's M&A, Nominating and Corporate Governance and Compensation committees.[40]  He is named in Counts I (HD Vest) and IV (share repurchases).

---

[35] FAC ¶ 5.

[36] FAC ¶ 6.

[37] FAC ¶ 4.

[38] FAC ¶ 106.

[39] FAC ¶ 8.

[40] FAC ¶ 116.

10

Director Defendant, Mary Zappone, has served on the Board since March 2015.[41] She has served as a member of the Board's Nominating and Corporate Governance and Compensation committees.[42] She is named only in Count I (HD Vest).

Non-parties, William Atwell, John Clendening and H. McIntyre Gardner began serving on the Board as of March 1, 2017.[43] Non-parties, Steven Aldrich and Georganne Proctor, joined the Board after May 25, 2017.[44] Proctor serves as Chair of Blucora's Audit Committee.[45]

**The Non-Director Individual Defendant:**

Defendant, George Allen, was an independent contractor retained by Blucora in October 2011 to assist with the Company's merger and acquisition activity.[46] Allen subsequently served as Blucora's Executive Vice-President for Corporate

---

[41] FAC ¶ 9.

[42] FAC ¶ 123.

[43] FAC ¶ 100.

[44] *Id.* As discussed below, May 2017 is significant, by Plaintiff's lights, because that is when the Board announced in a public filing that Plaintiff's claims, pending in California at that time, "are without merit." According to Plaintiff, this announcement reveals that the Demand Board is unfit to consider a stockholder demand to pursue the claims.

[45] FAC ¶ 132.

[46] FAC ¶ 11. Allen has consented to personal jurisdiction in Delaware for purposes of this litigation.

Development from May 2012 through July 2015, when he led the Company's "corporate development team tasked with finding additional acquisition opportunities."[47] Allen left Blucora in July 2015 to serve as CIG's Chief Investment Officer.[48] Plaintiff alleges (in Count V) that Allen, CIG, CIG I and Snyder engaged in an insider trading scheme as the Board was authorizing the challenged share repurchases.[49]

## B. The Monoprice Acquisition

On August 22, 2013, Blucora closed on a $182.9 million all-cash acquisition of Monoprice, an online retailer of consumer electronics and accessories.[50] According to Plaintiff, Blucora "expended a significant percentage of its cash, as well as cash equivalents and short-term investments available-for-sale, a substantial portion of which was comprised of borrowed funds" to acquire a failing company.[51]

The M&A Committee identified Monoprice as a potential target after reviewing financial and marketing materials in which Monoprice identified itself as

---

[47] *Id.*

[48] *Id.*

[49] FAC ¶¶ 68, 152.

[50] FAC ¶ 48.

[51] *See* FAC ¶¶ 49–50, 55, 59–60.

12

a company with "a unique and defensible market position."[52] The Board then conducted a competitive analysis of Monoprice, which identified competition from Amazon as a primary impediment to the success of the transaction.[53] As further diligence, the Board instructed Blucora's corporate development team to advise the M&A Committee on Monoprice-specifics, including its deteriorating online conversion rates,[54] and then sent Allen to China, in his capacity as Blucora VP for Corporate Development, to evaluate Monoprice's manufacturing facilities.[55] Upon his return, Allen prepared a thirty-page report in which he noted his observations of poor working conditions, very old equipment, disorganized business processes and an overall sense that the Monoprice team in China was "a bit out of [its] league."[56]

Even though several negative aspects of the transaction were identified during its due diligence, on July 30, 2013, the M&A Committee "informed th[e] Board that the . . . Committee . . . had reviewed and thoroughly considered the proposed terms of the Stock Purchase Agreement ["SPA"] and . . . unanimously recommended that

---

[52] FAC ¶ 56.

[53] FAC ¶ 58.

[54] FAC ¶ 59.

[55] FAC ¶ 60.

[56] *Id.*; *see also* Jan. 31, 2018 Transmittal Aff. of Lori Will in Supp. of Nominal Def. Blucora, Inc.'s Mot. to Dismiss ("Jan. 31 Will Aff."), Ex. F (Monoprice Site Visit Report, dated July 22, 2013) (D.I. 27).

the Board authorize and approve the [deal] . . . ."[57] The Board followed the M&A Committee's recommendation, approved the acquisition on July 30, 2013, disclosed the SPA to the market the following day and closed the transaction on August 22, 2013, with a final purchase price of $182.9 million.[58]

Monoprice did not perform well post-closing. Within the first year, Blucora fired Monoprice's President and wrote-down $62.6 million of its investment.[59] Two years after closing, Blucora began shopping Monoprice "with the goal of completing a divestiture in the first half of 2016."[60] By September 2016, Monoprice remained for sale and Blucora had written off $146.4 million of the Monoprice purchase.[61] All the while, Monoprice continued to miss revenue forecasts.[62] According to Plaintiff, the Board would have seen this disaster coming had it only bothered to look. The failure to look, it is alleged, constituted bad faith.[63]

---

[57] FAC ¶ 64; *see also* Jan. 31 Will Aff., Ex. D (Board Mins. dated July 30, 2013).

[58] FAC ¶¶ 48, 62.

[59] FAC ¶¶ 49–51.

[60] FAC ¶ 51.

[61] *Id.*

[62] FAC ¶ 66.

[63] Pl.'s Answer to Blucora's R. 23.1 Mot. to Dismiss ("Pl.'s Blucora Answering Br.") 39–40 (D.I. 45) (citing FAC ¶¶ 48–67).

On November 14, 2016, Blucora announced a definitive agreement to sell Monoprice for $40 million cash, substantially less than the $182.9 million price it paid just three years earlier.[64] The $142 million delta between what Blucora paid and ultimately received for Monoprice is not the only alleged loss. According to Plaintiff, the ill-conceived transaction also depleted Blucora's much needed cash and forced it to take on substantial debt to fund its operations.[65]

## C. Blucora Share Repurchases and Alleged Insider Trading

Blucora initiated a share repurchase program in February 2013.[66] The Board's repurchase authorization included a price ceiling of $20 per share and limited the total size of any authorization to $50 million.[67] On November 14, 2013, the Board unanimously adopted a resolution that eliminated "the maximum price per share limitation . . . ."[68] A month later, with the price ceiling removed, Blucora

---

[64] FAC ¶¶ 52–54. Plaintiff alleges the $40 million sale price included Target Net Working Capital ("NWC") of $26 million, which is $10.8 million more than the Target NWC to which Blucora agreed when it acquired Monoprice in 2013. The net result, according to Plaintiff, is that the actual sale price was $29.2 million. *Id.*

[65] FAC ¶¶ 53–56.

[66] FAC ¶¶ 84–85.

[67] FAC ¶¶ 84, 90.

[68] FAC ¶ 84.

repurchased $6.4 million of its shares at an average price of $28.66.[69] This was substantially more than the Board had ever authorized for share repurchases.[70]

Blucora's share repurchases continued apace through the following May, when the Board increased Blucora's repurchase authorization from $50 million to $85 million.[71] Following the increase, during 2014, Blucora repurchased an additional $38.6 million of its shares at an average cost of $16.85,[72] bringing the December 2013 through 2014 repurchase total to more than $45 million.[73] Plaintiff alleges Blucora's "unprecedented share repurchases" served no valid corporate purpose and occurred during a time when Blucora was especially cash-strapped.[74] In this regard, Plaintiff points to the Company's $322 million debt and "dwindling available cash" as of December 2013.[75]

Around the time the Board eliminated the authorization price ceiling, Snyder notified Blucora's General Counsel/Compliance Officer of his intent to sell a portion

---

[69] FAC ¶ 85.

[70] FAC ¶ 83.

[71] FAC ¶ 90.

[72] *Id.*

[73] FAC ¶ 92.

[74] FAC ¶ 91.

[75] *See* FAC ¶¶ 85, 93.

16

of CIG's Blucora holdings.[76] On November 20, 2013, through CIG I, Snyder sold 1,006,093 Blucora shares for $28.50 per share.[77] The next day CIG I exercised a warrant it was issued in 2011 to purchase one million shares at a strike price of $9.62.[78] Allen allegedly entered a Rule 10b5-1 plan that same day.[79] He then sold 27,000 shares between December 26, 2013 and January 2, 2014, at share prices ranging from $28.33 to $29.52.[80]

Plaintiff alleges the insider trades were part of a plan to exploit Blucora's share repurchases as a means to boost Blucora's share price just in time for Snyder, CIG, CIG I and Allen to sell their Blucora shares.[81] As pled, this scheme was motivated by Monoprice's underperformance, information known to Snyder, Allen and the other Board members, but not disclosed to the market until February 11,

---

[76] FAC ¶ 76.

[77] FAC ¶ 68.

[78] FAC ¶ 77. The warrant's $9.62 strike price, exercised at a time when the shares traded between $28.82 and $29.61, amounted to CIG's recognition of approximately $20,000,000 in ordinary income.

[79] FAC ¶ 69. SEC Rule 10b5-1 plans provide a safe harbor for insider share sales, provided the insider is not trading on material nonpublic information.

[80] *Id.*

[81] FAC ¶¶ 70, 81; *see also* Pl.'s Answer to CIG Defs., Snyder and Allen's Mot. to Dismiss Count V 30 (D.I. 48).

2014.[82] According to Plaintiff, "[b]y year-end 2014, Blucora's stock price had fallen to less than half the price at which CIG had sold [its] 1,006,093 shares . . . ."[83]

## D. The HD Vest Acquisition

In 2015, Blucora was looking to realign its business.[84] To this end, it launched a six-month process with its financial advisor, GCA, to identify potential acquisition targets.[85] At the time, Blucora's business focused on Internet Search, e-commerce (Monoprice) and online tax filing software businesses.[86] If Blucora and GCA could find the right acquisition opportunity, Blucora was prepared to divest its Internet Search and Monoprice businesses to facilitate the realignment.[87]

By letter dated April 17, 2015, GCA confirmed discussions with Allen regarding GCA's engagement "to assist with target identification and potential execution of a buyside transaction."[88] The engagement agreement confirmed an

---

[82] FAC ¶ 73.

[83] *Id.*

[84] FAC ¶¶ 22, 51; Oral Arg. on Defs.' Mots. to Dismiss & Mot. to Disqualify Tilden Tr. ("Oral Arg. Tr.") 50:1–2 (July 11, 2018) (D.I. 79).

[85] FAC ¶ 12; Oral Arg. Tr. 50:7–14.

[86] Jan. 31 Will Aff., Ex. A (Blucora Form 10-Q dated Oct. 26, 2017) at 6; Oral Arg. Tr. 49:16–20.

[87] FAC ¶ 51; Pl.'s Blucora Answering Br. 6; Oral Arg. Tr. 52:4–7.

[88] FAC ¶ 22.

initial term of three months that would be extended automatically for an additional three months if GCA had not yet located a suitable opportunity.[89] GCA's fee structure comprised: (1) a fixed $25,000 monthly retainer; (2) five transaction fee tiers ranging, on the low end, from a $1,700,000 fee for consummation of a transaction valued at $200,000,000 or less, up to a $4,250,000 fee for consummation of a transaction valued at $500,000,000 or more; and (3) a $500,000 flat fee for the delivery of a fairness opinion (to be credited against any transaction fee payable to GCA).[90]

By June 2015, GCA had identified HD Vest, a "leading independent broker-dealer providing wealth management and advisory solutions for tax professionals,"[91] as a potential target.[92] Soon after, GCA presented the Board with an initial "valuation overview" of HD Vest based on selected comparable transactions.[93] GCA's overview applied a range of "Transaction Multiples" to value HD Vest from $360 million to $495 million.[94] As the HD Vest negotiations progressed, GCA

---

[89] *Id.*

[90] FAC ¶¶ 23–24.

[91] *See* Jan. 31 Will Aff., Ex. I ("Blucora Form 8-K dated Oct. 14, 2015") at Ex. 99.1.

[92] *See* FAC ¶ 41.

[93] FAC ¶¶ 36, 41.

[94] FAC ¶ 41.

determined that HD Vest would not accept less than $600 million.[95] GCA conveyed this view to Blucora, as reflected in an email from Ruckelshaus to certain other Director Defendants.[96]

On October 13, 2015, following weeks of negotiations and due diligence, the Board held a twenty-five minute meeting to review and discuss a twenty-nine page GCA presentation and separate fairness opinion in which GCA concluded that the HD Vest acquisition, now priced at $580 million, was "fair, from a financial point of view, to Blucora."[97] The following day, Blucora publicly announced that it had entered into a merger agreement with HD Vest and would explore the divestiture of Monoprice.[98]

Plaintiff alleges the Board improperly incentivized GCA to pursue and then recommend the HD Vest acquisition through the five-tier fee structure.[99] The Board then failed properly to scrutinize GCA's work and ultimately allowed a flawed

---

[95] FAC ¶ 42.

[96] *Id.* (Ruckelshaus emailed Snyder, Chung and Walters: "I believe there is a good chance [the private equity firm] walks if we re-price below $600M. (This is also the view of our bankers based on their interactions.)").

[97] FAC ¶¶ 28, 36. *See also* Blucora Form 8-K dated Oct. 14, 2015 at Ex. 99.1.

[98] *See* FAC ¶ 51; Blucora Form 8-K dated Oct. 14, 2015 at Ex. 99.1.

[99] FAC ¶ 31.

20

fairness opinion to stand untested.[100]  The result of this failure, according to Plaintiff, is that the Board caused Blucora to pay far more for HD Vest than it was worth.

### E. Procedural Posture

Despite Blucora's clear Delaware forum selection bylaw, on March 5, 2015, Plaintiff's law firm filed a derivative complaint on behalf of another plaintiff, Remigius Shatas, against Snyder and CIG for insider trading in the Superior Court of King County, Washington.[101]  Citing Blucora's forum selection bylaw, the Company moved to dismiss the Washington Complaint for improper venue.  The trial court enforced the bylaw and dismissed the complaint.  Shatas appealed.[102]  The Washington Court of Appeals reversed and remanded with directions that the trial court first determine whether Snyder and CIG were subject to personal jurisdiction

---

[100] FAC ¶¶ 41–43.

[101] *See* FAC ¶ 16 ("Section 2.16 of Blucora's Amended and Restated Bylaws designates "a state or federal court located within the state of Delaware" as "the sole and exclusive forum for . . . any derivative action . . . ."); Def. Blucora's Opening Br. 12.  *See also* Jan. 31 Will Aff., Ex. F ("Washington Complaint").

[102] *See Shatas v. Snyder*, 2015 WL 12804487 (Wash. Super. Ct. May 18, 2015) (dismissing the first derivative action), *rev'd*, 2016 WL 6084113 (Wash. Ct. App. Oct. 17, 2016).

21

in Delaware before enforcing the Delaware forum selection bylaw.[103]  Following remand, the parties agreed to a stipulated dismissal without prejudice.[104]

Plaintiff's law firm filed a second derivative action in San Francisco on December 12, 2016.[105]  While that action was pending, Blucora filed its quarterly Form 10-Q on May 4, 2017, in which it stated, "[t]he Company believes that the plaintiffs' claims [in the California action] are without merit and will vigorously defend this lawsuit."[106]  Soon after, the California court dismissed Tilden's complaint (by now he was the representative plaintiff) on the ground that Tilden's claims were "subject to Blucora's Forum Bylaw designating the state of Delaware as the sole and exclusive forum for actions of this nature."[107]  The FAC is the *third* rendition of Plaintiff's "identical derivative claims."[108]

---

[103] *Id.*  The appellate court's focus was on whether Delaware was actually an available alternative forum given possible personal jurisdictional defenses that might have been available to certain of the defendants.

[104] Def. Blucora's Opening Br. 13.

[105] FAC ¶ 20; *see also* Def. Blucora's Opening Br. 14; Jan. 31 Will Aff., Ex. M ("California Complaint").

[106] FAC ¶ 101; Jan. 31 Will Aff., Ex. Q ("May 2017 Form 10-Q") at 19–20.

[107] FAC ¶ 100 n.34 & Ex. A.

[108] *See* FAC ¶¶ 16, 20.

While the appeal in Washington was pending, Plaintiff demanded and obtained certain books and records from Blucora under 8 *Del. C.* § 220.[109] On July 28, 2017, Plaintiff made an additional demand and Blucora produced more documents.[110] Plaintiff commenced this derivative action on November 22, 2017. On January 31, 2018, the Director Defendants, GCA, CIG, CIG I and Allen filed separate motions to dismiss the FAC.

## II. ANALYSIS

Before reaching the merits of Plaintiff's claims, the Court must first determine whether Plaintiff has met his burden to plead particularized facts that support a finding of demand futility as to a majority of the Demand Board. As explained below, he has not. Although the analysis could end there, for the sake of completeness, I have elected to take up Defendants' arguments that Plaintiff has failed to state any viable claims. Here again, Defendants are correct. Plaintiff has failed to state claims upon which relief may be granted.

### A. Demand Is Not Excused

"[A] cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the

---

[109] FAC ¶ 19.

[110] FAC ¶ 20.

corporation."[111]  Each of Plaintiff's claims allege harm suffered by Blucora.  As such, the parties agree that the claims are derivative.[112]  Because stockholder derivative suits "by [their] very nature . . . impinge on the managerial freedom of directors,"[113] our law requires that a stockholder satisfy the threshold demand requirements of Court of Chancery Rule 23.1 before he may assume control of a claim belonging to the corporation.  To do so, the plaintiff must demand that the board of directors pursue the claim or, alternatively, demonstrate that a demand on the board would be futile such that the demand requirement should be excused.[114]

Plaintiff acknowledges he made no pre-suit demand.[115]  Accordingly, Rule 23.1 places a heightened burden on Plaintiff to plead demand futility by meeting "stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" embodied in Court of Chancery Rule 8 and

---

[111] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (citing 8 *Del. C.* § 141(a)).

[112] Pl.'s Blucora Answering Br. 16 (citing *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993)).

[113] *Aronson*, 473 A.2d at 811.

[114] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1044 (Del. 2004).

[115] FAC ¶ 98.

facilitated by Court of Chancery Rule 12(b)(6)'s reasonable conceivability standard.[116]

This Court employs one of two tests when determining whether demand upon the board would be futile. The first applies when a plaintiff challenges a decision of the board of directors to take affirmative action.[117] The second, established in *Rales v. Blasband*,[118] applies where, as here, a plaintiff challenges board inaction or challenges action taken by less than a majority of the board.[119] Under the *Rales* test, the court "must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[120]

---

[116] *Brehm*, 746 A.2d at 254.

[117] *Aronson*, 473 A.2d at 814.

[118] *Rales*, 634 A.2d at 934.

[119] *See Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) ("The [*Rales*] test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties."); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 56–57 (Del. Ch. 2015) (explaining that *Rales* applies where "a derivative plaintiff challenges a decision approved by . . . less than half of the directors who would have considered a demand").

[120] *Rales*, 634 A.2d at 934.

The following chart, set forth in Blucora's Opening Brief,[121] depicts the distinction and overlap between the Director Defendants and the Demand Board:

| **Director Defendants** | **Demand Board** |
|---|---|
| John E. Cunningham | |
| David H.S. Chung | |
| Steven W. Hooper | |
| Elizabeth J. Huebner | |
| Andrew M. Snyder | |
| William J. Ruckelshaus | |
| Lance Dunn | Lance Dunn |
| Christopher Walters | Christopher Walters |
| Mary Zappone | Mary Zappone |
| | William Atwell |
| | Steven Aldrich |
| | H. McIntyre Gardner |
| | Georganne C. Proctor |
| | John S. Clendening |

Of the eight member Demand Board, five joined after the three transactions at issue were consummated and seven are considered independent under NASDAQ listing rules.[122] For purposes of demand futility, therefore, the Court will focus on

---

[121] Def. Blucora's Opening Br. 4.

[122] *See* Jan. 31 Will Aff., Ex. B (Blucora Schedule 14A dated Apr. 20, 2017) at 15. Only one Demand Board member, Dunn, was a member of the Board at the time of the

26

Aldrich, Atwell, Clendening, Gardner and Proctor, the five Demand Board members who indisputably joined the Board after any challenged conduct occurred. Given Plaintiff's tacit acknowledgement that these Demand Board members do not face a "substantial likelihood of liability" on any of Plaintiff's claims,[123] the Court's function is to determine whether they face other conflicts that would disable them from impartially considering a demand.[124] I address each director in turn.

## 1. Aldrich

Plaintiff does not question the independence or disinterestedness of Aldrich who joined the board on June 1, 2017,[125] after any challenged conduct occurred and after the Board publicly expressed its view of the merits of Plaintiff's California

---

Monoprice acquisition and the 2013 share repurchases; two Demand Board members, Dunn and Walters, were Board members at the time of the 2014 share purchases; and three Demand Board members, Dunn, Walters and Zappone, were Board members at the time of the HD Vest acquisition.

[123] *See In re Citigroup Inc. S'holders Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) (noting that a plaintiff can plead demand futility under *Rales* when he pleads particularized facts that reveal a director engaged in conduct "so egregious on its face that . . . a substantial likelihood of director liability . . . exists.").

[124] *See In re Ezcorp, Inc. Consulting Agmt. Deriv. Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016) ("To determine whether the Board could properly consider a demand, a court counts heads."); *In re infoUSA, Inc.*, 953 A.2d 963, 983 (Del. Ch. 2007) ("Successful derivative plaintiffs . . . focus intensely upon individual director's conflicts of interest . . . .").

[125] *See* FAC ¶ 99 n.32. *See also* Def. Blucora's Opening Br. 21; Pl.'s Blucora Answering Br. 13.

27

claims. Aldrich is indisputably fit, therefore, to consider a pre-suit demand under *Rales*.

## 2. Atwell and Gardner

Non-party Directors Atwell and Gardner were appointed to the Board on February 28, 2017.[126] Plaintiff's only proffered basis to argue that Atwell and Gardner could not impartially consider a pre-suit demand is that they were directors when Blucora filed its quarterly Form 10-Q with the SEC on May 4, 2017. In that filing, the Board stated its belief that the claims brought in the California Action were "without merit" and announced its intent to "vigorously defend" the lawsuit.[127] According to Plaintiff, this disclosure reveals that the Board had improperly prejudged the merits of his claims, thereby rendering them incapable of impartially considering any demand he might have made prior to initiating this litigation.

This court rejected Plaintiff's "prejudgment" demand excusal argument in *Highland Legacy Ltd. v. Singer*.[128] There, a derivative plaintiff argued the company's statement in a Form 8-K—that "[the company] believes . . . these lawsuits have no merit and intends to vigorously defend these lawsuits"—evidenced

---

[126] Jan. 31 Will. Aff., Ex. P (Blucora Form 8-K dated Feb. 28, 2017) at 1.

[127] FAC ¶ 101; May 2017 Form 10-Q at 19–20.

[128] *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *6 (Del. Ch. Mar. 17, 2006).

28

the board's inability to consider a demand to prosecute those claims.[129] Vice Chancellor Lamb unequivocally rejected the argument:

> The bare allegation that a company publicly announced that it believed the litigation lacked merit cannot by itself reach the heightened pleading standard of Rule 23.1. Public statements about the merits (or lack thereof) of derivative litigation are routinely made in SEC filings. It would be unreasonable for this court to conclude that a board made up of a majority of independent directors could not be asked to pursue this litigation simply because the company expressed a belief in a public filing that the claims in a series of related litigations were unfounded.[130]

Plaintiff maintains that *Singer* is somehow distinguishable because "Blucora board members met regularly with outside counsel to receive updates and discuss [litigation] strategy."[131] If anything, this would suggest that the Board was informed when it publicly disclosed its view of the California claims. In any event, the fact that the Board received legal advice from the company's outside counsel does not alter its ability impartially to assess the merits of pending legal claims, and does not in any way undermine the rationale of the holding in *Singer*. Independent and

---

[129] *Id.*

[130] *Id.* *See also Kops v. Hassell*, 2016 WL 7011569, at *2-3 (Del. Ch. Nov. 30, 2016) (holding that a company's proclamation of "innocence" in a New York Times advertisement did not constitute "*de facto* demand rejection" when the complaint failed to plead particularized facts that the board had improperly determined its position pre-suit). *But cf. Biondi v. Scrushy*, 820 A.2d 1148, 1166 (Del. Ch. 2003) (finding that a special committee's "publicly and prematurely issued statements exculpating one of the key company insiders whose conduct is supposed to be impartially investigated," while the investigation was underway, undermined the court's confidence in the special litigation committee's process).

[131] FAC ¶ 100; Pl.'s Blucora Answering Br. 20–21.

disinterested directors are presumed to be fit to evaluate impartially the merits of a demand to pursue legal claims.[132] That the Board assessed the merits of the claims after they were filed in California but before receiving a demand, without more, cannot overcome this presumption.[133]

### 3. Clendening

Non-party Director Clendening became a director and Blucora's President and Chief Executive Officer on April 4, 2016.[134] Plaintiff proffers two reasons why Clendening is not fit to consider a pre-suit demand. First, he argues Clendening was on the Board when Blucora issued the Form 10-Q in which the Board improperly prejudged Plaintiff's claims. I have already rejected this fact as a basis to plead demand futility. Next, Plaintiff alleges that "[i]t is against Clendening's immediate personal financial interests to in any way prolong the life of claims" that may depress Blucora's stock price because Clendening is a Blucora stockholder and a party to a

---

[132] *See Beam*, 845 A.2d at 1046 n.8, 1048–49.

[133] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("The [business judgment] rule posits a powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'") (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)). Plaintiff's bald speculation that the retirements of Snyder and Cooper from the Board a few weeks after the filing of the Form 10Q supports an inference that these Board members pushed their colleagues to issue the public statement as a condition of their retirement, to put it mildly, falls well short of the particularized facts required to plead demand futility. *See* Pl.'s Blucora Answering Br. 21.

[134] FAC ¶¶ 135, 137.

Rule 10b5-1 stock trading plan that allows him to sell "up to 213,100 shares" of Blucora stock between February and May 2018.[135] This states no basis to challenge Clendening's fitness under *Rales*.

"Speculation on motives for undertaking corporate action are wholly insufficient to establish a case of demand excusal."[136] Plaintiff's purely speculative belief that Clendening would be unable to exercise his otherwise independent business judgment in considering a demand simply because he would fear that the litigation might depress the value of his Blucora stockholdings falls far short of the mark. This is particularly so given that Plaintiff has not even attempted to plead that these holdings are material to Clendening.[137] Indeed, nearly every director of every publicly traded company owns stock in the company, some more than others. If it were enough to plead director interestedness merely by alleging that the director's holdings *might be* devalued as a result of derivative litigation, it is difficult to

---

[135] FAC ¶ 137.

[136] *Grobow*, 539 A.2d at 188.

[137] *See Freedman v. Adams*, 2012 WL 1345638, at *6 (Del. Ch. Mar. 30, 2012) ("'Directorial interest . . . exists where a corporate decision will have a *materially detrimental impact* on a director, but not on the corporation or stockholders.' Generally, the interest at issue must be material to the director, and materiality is assessed based upon the individual director's economic circumstances.") (quoting *Rales*, 634 A.2d at 936) (emphasis supplied).

31

imagine how a plaintiff would not carry his *heightened* burden to plead demand futility in nearly every derivative case. That is not our law.

### 4. Proctor

Proctor joined the Board on June 1, 2017.[138] Prior to joining the Board, she was a member of SunEdison, Inc.'s board of directors and chaired its audit committee.[139] Plaintiff alleges Proctor is involved in litigation in the United States District Court for the Southern District of New York arising from her board service at SunEdison.[140] According to Plaintiff, SunEdison "collapsed" in 2016 and Proctor "is an individually-named defendant in a multitude of resulting shareholder and ERISA litigation" where the company's D&O coverage may be inadequate to cover the liability.[141] This, according to Plaintiff, renders Proctor unable impartially to consider a demand because the Defendants face similar liability on similar claims here.[142]

Plaintiff's allegation that Proctor faces a "situational conflict," given her liability exposure in unrelated litigation, is not novel. In *Guttman v. Huang*, then-

---

[138] *See* Jan. 31 Will Aff., Ex. O (Blucora Form 8-K dated June 5, 2017).

[139] FAC ¶ 132.

[140] FAC ¶ 133.

[141] *Id.*

[142] FAC ¶¶ 133–34.

Vice Chancellor Strine observed that "directors can be compromised for purposes of considering a demand if they face a *significant likelihood* of liability relating to the subject matter of the complaint."[143] Because the directors in *Guttman* were not named defendants in the supposedly related federal securities litigation, the court ultimately determined that demand was not excused.[144] In *Pfeiffer v. Toll*, the court found demand was futile because a majority of the demand board faced a significant likelihood of liability in companion federal securities litigation.[145] Under those circumstances, the court was satisfied that if "the Company pressed forward with its rights of action against the defendants in [the Delaware] case, then the Company's efforts would undercut or even compromise the defense of the federal securities action."[146]

This case bears no resemblance to *Guttman* or *Pfeiffer*. First, the SunEdison litigation is not parallel litigation or even related to this derivative litigation. Nothing the defendants say or do here will "undercut or even compromise" the defense of the SunEdison case, or vice versa. Second, and more importantly, the FAC says nothing

---

[143] *Guttman v. Huang*, 823 A.2d 492, 503 (Del. Ch. 2003) (emphasis supplied).

[144] *Id.* at 504.

[145] *Pfeiffer v. Toll*, 989 A.2d 683, 690 (Del. Ch. 2010) (involving companion litigation that had survived a motion to dismiss), *abrogated on other grounds by Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831 (Del. 2011).

[146] *Id.*

of (much less allege with any particularity) how Proctor's defenses in the SunEdison litigation could render her unable to exercise her disinterested business judgment regarding a demand on Blucora. Given that Plaintiff has failed to plead any specifics regarding how Proctor faces legal jeopardy, the FAC's speculative allegations of a situational conflict are inadequate to disqualify her from considering a demand.[147]

*****

The FAC raises no reasonable doubt that at least five of the eight members of the Demand Board are disinterested, independent and fully capable of impartially exercising their business judgment when considering a pre-suit demand. Accordingly, Plaintiff has failed to carry his burden of pleading that demand is excused and the FAC must be dismissed for this reason alone. Even though the analysis could end here, for the sake of completeness, and given that the named Defendants have argued separately and strenuously that Plaintiff has failed to state viable claims against them, I take up those arguments as well.

---

[147] *See Rattner v. Bidzos*, 2003 WL 22284323, at *14 (Del. Ch. Sept. 30, 2003) (considering whether the existence of pending federal securities actions might render directors unable impartially to consider a demand, the court observed that "[t]he only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California," and then held that such "conclusory and cryptic allegations" concerning a companion federal securities action left "far too much to the imagination" and were insufficient to support demand excusal under Rule 23.1).

## B. The FAC Fails to State Viable Claims

Under Court of Chancery Rule 12(b)(6), dismissal is appropriate only if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts pled in the complaint.[148] In considering a motion to dismiss, the court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in Plaintiff's favor.[149]

As explained below, several of Plaintiff's claims are time-barred. Even if timely, none of the claims as pled are viable as a matter of law. These are separate grounds for dismissal.

### 1. Laches

Defendants argue that Counts III, IV and V, which arise from the Monoprice acquisition, share repurchases and alleged insider trading, are barred by laches. I agree.

"Laches is an equitable defense born from the longstanding maxim equity aids the vigilant, not those who slumber on their rights."[150] It is "generally defined as an

---

[148] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[149] *Id.*

[150] *Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009); *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982).

unreasonable delay by the plaintiff in bringing suit after the plaintiff learned of an infringement of his rights, thereby resulting in material prejudice to the defendant."[151]  To invoke laches at the pleadings stage, Defendants must demonstrate on the face of the operative pleading that: (a) Plaintiff had knowledge of his rights; (b) Plaintiff unreasonably delayed in bringing suit to vindicate those rights; and (c) the delay resulted in injury or prejudice to the Defendants.[152]

Although statutes of limitations generally do not govern in equity,[153] because equity follows the law, "a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches."[154]  This is especially so where, as here, a plaintiff brings equitable and legal claims seeking only legal relief.  In such circumstances, "when claims are barred by a controlling statute of limitations, a court of equity need not engage in a traditional laches analysis."[155]

---

[151] *Reid*, 970 A.2d at 182.

[152] *Akrout v. Jarkoy*, 2018 WL 3361401, at *8 (Del. Ch. July 10, 2018) (citing *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 210 (Del. 2005)).

[153] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *3 (Del. Ch. July 17, 1998).

[154] *CMS Inv. Hldgs., LLC v. Castle*, 2016 WL 4411328, at *2 (Del. Ch. Aug. 19, 2016) (quoting *Adams*, 452 A.2d at 157).

[155] *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 527 (Del. Ch. 2005).  *See also Kraft v. WisdomTree, Invs., Inc.*, 2016 WL 4141112, at *10–11 (Del. Ch. Aug. 3, 2016) (holding that this court "will bar claims [seeking purely legal remedies] outside the limitations period absent tolling or extraordinary circumstances," even in the absence of demonstrable prejudice); *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del.

Under 10 *Del. C.* § 8106, a three-year limitations period applies to claims sounding in breach of fiduciary duty.[156] That statute begins to run upon accrual of the claim. And, "[t]he law in Delaware is crystal clear that a claim accrues as soon as the wrongful act occurs."[157] While our courts will toll the limitation period under certain circumstances,[158] "[m]ere ignorance of the facts by a plaintiff, where there has been no . . . concealment, is no obstacle to operation of the statute [of limitations.]"[159] Here, Blucora is a public company that filed mandated public disclosures (e.g., Form 10-Qs and Form 10-Ks). Plaintiff knew of or easily could have discovered the facts giving rise to his Monoprice, stock repurchase and *Brophy* claims at the time of the challenged transactions and well within the limitations period. Indeed, Plaintiff, either through his law firm or directly as plaintiff, attempted to litigate his claims in Washington and California within the three-year

---

Ch. Sept. 27, 2013) (explaining that defendants are implicitly prejudiced by the late-filing plaintiff, who had the fair opportunity to file within the period set by the applicable statute of limitations).

[156] 10 *Del. C.* § 8106(a); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 584 (Del. Ch. 2007).

[157] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *18 (Del. Ch. July 29, 2005).

[158] *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973) ("Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence.") (citing *Giordano v. Czerwinski*, 216 A.2d 874 (Del. 1966)).

[159] *Dean Witter*, 1998 WL 442456, at *5 (citing *Halpern*, 313 A.2d at 143).

37

limitations period. Having ignored Blucora's Delaware forum selection bylaw, however, his attempts to litigate in the improper fora met predictably negative case-dispositive outcomes.

After the Washington Court of Appeals remanded the jurisdictional question, the parties agreed to a tolling agreement from September 14, 2016 to December 31, 2016. The practical effect of this agreement is that the statute of limitations for fiduciary claims connected to the Monoprice acquisition, that began to run on August 22, 2013 (the date the deal closed), was tolled from September 2016 to December 2016. This, in turn, would have extended the three-year limitations period to May 31, 2017. Because the FAC was filed on November 22, 2017, this claim is time-barred.

As for the claims arising from Board decisions relating to Blucora's share repurchases—the removal of the $20 per share price ceiling on November 14, 2013[160] and the May 2014 decision to increase the number of shares that could be repurchased[161]—the latest possible date that the statute of limitations could have run was in May 2017. Likewise, Allen and Snyder's challenged stock sales occurred in

---

[160] FAC ¶ 84; Pl.'s Blucora Answering Br. 5.

[161] FAC ¶ 90.

late-2013 and early-2014 and, as such, any *Brophy* claim against them expired in early-2017, well before Plaintiff's November 2017 filing.[162]

Lest there be any doubt that a full-blown laches analysis (including prejudice) might justify a different result, the consequences of Plaintiff's deliberate litigation tactics expose the actual prejudice. Plaintiff chose to file actions in Washington and California where, combined, he asserted the same claims he eventually was forced to bring here.[163] He gambled and lost, not once but twice. And he forced Defendants to defend in the wrong fora every step of the way. This amounts to prejudice. Under these circumstances, "[t]here is nothing unreasonable about enforcing the forum selection clause against [Plaintiff] because any harm [he] has suffered is entirely self-inflicted."[164]

---

[162] *AIG*, 965 A.2d at 800, 811 (applying the three-year limitation period to a *Brophy* claim seeking to disgorge the alleged inside traders' profits).

[163] *See Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 955 n.96 (Del. Ch. 2015) (stockholders presumed to be on notice of, and impliedly assent to, the corporation's bylaws as may be amended).

[164] *Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Gp. (Hldg.)*, 2012 WL 4847089, at *11 (Del. Ch. Oct. 11, 2012), *aff'd*, 67 A.3d 373 (Del. 2013). *See also BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *12 (Del. Ch. Nov. 2, 2017) ("[a] party cannot rely on a suit knowingly filed in the wrong forum as a basis for avoiding the application of laches.") (citation omitted); *CMS Inv. Hldg.*, 2016 WL 4411328, at *3 ("Having chosen to disregard that [forum selection] clause . . . [plaintiffs] cannot now present the Colorado State Action as a basis for avoiding application of laches."); *Huffington v. T.C. Gp., LLC*, 2012 WL 1415930, at *10 (Del. Super. Apr. 18, 2012) (declining to apply Delaware's savings statute when the plaintiff "decided to pay no heed to [an enforceable] forum selection clause" and instead "chose a strategy that backfired.").

## 2. The FAC Fails Adequately to Plead Bad Faith

Plaintiff acknowledges that, in light of the Section 102(b)(7) provision in Blucora's certificate of incorporation, he must well-plead a breach of the duty of loyalty against the Director Defendants to state a viable claim.[165] Because none of the Director Defendants were interested in the challenged transactions, Plaintiff is obliged to plead bad faith.[166] As Vice Chancellor Glasscock astutely observed in *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, "bad faith is similar to the much older fiduciary prohibition of waste, and like waste, is a *rara avis* [rare bird]."[167]

---

[165] Pl.'s Blucora Answering Br. 27. Plaintiff disputes Blucora's characterization of his claims challenging the Monoprice and HD Vest acquisitions as *Caremark* claims. *See* Pl.'s Blucora Answering Br. 26, 38 ("Plaintiff's allegations . . . are based on [a] lack of good faith in approving the HD Vest acquisition."). His adamant disagreement is curious, however, when considered against his allegation that the Director Defendants are personally liable for their "conscious disregard and ***failure of oversight*** and good faith in connection with the HD Vest acquisition, the Monoprice acquisition, and the Company's share repurchases." FAC ¶ 107 (emphasis supplied). *See also* FAC ¶¶ 117, 124. Notwithstanding Plaintiff's attempt to distance his claims from *Caremark*, the essence of his claim is that the Director Defendants acted in bad faith, in breach of their duty of loyalty, by failing to see purported red flags that would have alerted them that the Monoprice and HD Vest acquisitions would result in "corporate trauma" to Blucora. *See Stone*, 911 A.2d at 370 (holding that "because a showing of bad faith conduct, in the sense described in *Disney* and *Caremark*, is essential to establish director oversight liability, the fiduciary duty violated by that conduct is the duty of loyalty," and "*Caremark* articulates the necessary conditions predicate for director oversight liability," namely a "conscious[] fail[ure] to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.").

[166] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

[167] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016).

40

Salient examples of bad faith conduct include circumstances where fiduciaries intentionally break the law, "intentionally act[] with a purpose other than that of advancing the best interests of the corporation" and "intentionally fail[] to act in the face of a known duty to act, demonstrating a conscious disregard [of] duties."[168] As our Supreme Court explained in *Disney*, to state a claim for bad faith such that a corporate fiduciary will be stripped of the presumption of good faith, the plaintiff must well-plead an "*intentional* dereliction of duty" or "*conscious disregard* for one's responsibilities," both of which reflect conduct "more culpable than simple inattention or failure to be informed of all facts material to the decision."[169] Stated differently, and perhaps more simply, to plead a claim for bad faith in the oversight context, a plaintiff must plead facts that allow a reasonable inference that the director acted with "scienter," a state of mind that "requires [not only] proof that a director acted inconsistent[ly] with his fiduciary duties," but also "most importantly, that the director *knew* he was so acting."[170] In determining whether scienter has been well-

---

[168] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006).

[169] *Id.* at 66.

[170] *In re Massey Energy Co.*, 2011 WL 2176479, at *22 (Del. Ch. May 31, 2011) (emphasis in original). *See also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (holding that to plead bad faith the plaintiff must well-plead that "the directors *knew* that they were not discharging their fiduciary obligations."); *Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *7 (Del. Ch. Oct. 18, 2016) ("The need to demonstrate scienter to establish liability under an oversight theory follows not only from *Caremark*

41

pled, our courts must be mindful that Delaware law does not "subject directors, even expert directors, to personal liability for failure to predict the future and to properly evaluate business risk."[171]

### (a) The HD Vest Acquisition – Counts I and II

Plaintiff does not allege the Director Defendants consciously approved an inflated acquisition price for HD Vest. Instead, he alleges that the Board's reliance

---

itself, but from the existence of charter provisions exculpating directors from liability for breaches of the duty of care that have become ubiquitous in corporate America.").

[171] *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011). *See also Oklahoma Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *18 (Del. Ch. Dec. 18, 2017) ("The Plaintiffs' theory appears to be that the Defendants' oversight failures caused Banamex to engage in a business venture that generated large losses because of fraud by the party on the other side. Put differently, Banamex made a risky business decision that turned out poorly for the company. That suggests a failure to monitor or properly limit business risk, a theory of director liability that this Court has never definitively accepted. Indeed, evaluation of risk is a core function of the exercise of business judgment."); *Asbestos Workers Local 42 Pension Fund v. Bammann*, 2015 WL 2455469, at *14 (Del. Ch. May 22, 2015) ("It is not entirely clear under what circumstances a stockholder derivative plaintiff can prevail against the directors on a theory of oversight liability for failure to monitor business risk under Delaware law; the Plaintiff cites no examples where such an action has successfully been maintained. Business risk is the very stuff of which corporate decisions are constituted. Where, as here, the allegations are that the level of risk being undertaken by management was reported to the board, and the board acted (or failed to act) in a way that, in hindsight, proved costly to the corporation, and which the derivative plaintiff, with the benefit of that hindsight, brands wrongful, it is difficult to see how successful maintenance of that derivative action can be consistent with this jurisdiction's model of corporate governance . . . ."); *Citigroup*, 964 A.2d at 131 ("To impose oversight liability on directors for failure to monitor 'excessive' risk would involve courts in conducting hindsight evaluations of decisions at the heart of the business judgment of directors."). *Accord, Houseman v. Sagerman*, 2014 WL 1600724, at *7 (Del. Ch. Apr. 16, 2014) (holding that the existence of "*some* process" will bar a finding of bad faith); *Lyondell*, 970 A.2d at 243 (alleging that "the directors failed to do all that they should have under the circumstances" fails to state a loyalty claim).

42

upon the work of its financial advisor, GCA, reflects an "intentional dereliction of duty" and "conscious disregard of red flags."[172]  Specifically, it is alleged that the "structure of the fee agreement gave GCA every incentive to keep a transaction within its highest level value tier (greater than $500,000,000) in order to maximize its fee."[173]  According to Plaintiff, mindful of these incentives, the Board acted in bad faith by not more carefully scrutinizing GCA's valuation work throughout the engagement, including during the infamous 25-minute "sham" meeting on October 13, 2015, when the Board received GCA's fairness opinion and the allegedly "manipulated" HD Vest valuation.[174]  Plaintiff's hindsight critique of the Board fails on multiple grounds.

First, GCA's fee for delivery of a fairness opinion was not contingent; it was a $500,000 flat fee that would be credited against the overall transaction fee.[175] Second, Plaintiff's conclusory allegations regarding the so-called sham Board meeting ignores the full scope of the Board's process and the many other instances where the Board considered the *bona fides* of the HD Vest acquisition.[176]  Third,

---

[172] Pl.'s Blucora Answering Br. 28.

[173] FAC ¶ 31.

[174] *See* Pl.'s Blucora Answering Br. 29–34.

[175] FAC ¶¶ 23–24.

[176] *See, e.g.*, Apr. 9 Supplemental Transmittal Aff. of Lori Will in Supp. of Reply Br. in Further Supp. of Nominal Def. Blucora, Inc.'s Mot. to Dismiss, Ex. EE (Board Mins. dated

Plaintiff's attack on GCA's work rather deliberately focuses on only one of the several methodologies GCA employed to value HD Vest and then speculates that GCA must have revised its analysis to inflate its valuation and thereby earn a higher fee.[177] Of course, Plaintiff pleads no non-conclusory facts to support this allegation. Finally, Plaintiff fails to plead any facts that would allow a reasonable inference that the Board actually *knew* GCA had manipulated its financial analysis, even assuming he had well-pled that such manipulation had occurred.[178] The bottom line is Plaintiff would have the Court second-guess the Board's informed decision to acquire HD Vest even though he has pled no facts to suggest that the Board had any interest

---

Oct. 8, 2015); Jan. 31 Will Aff., Ex. T (Board Mins. dated Oct. 13, 2015) (providing that written materials were provided in advance and the final status of the negotiations were discussed at the meeting).

[177] FAC ¶¶ 41–43 (citing GCA's June 2015 initial HD Vest "Valuation Overview," which was based on selected comparable transactions, in support of the speculation that any difference between the "Overview" and the final deal price must have been the result of GCA manipulation).

[178] *See In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *12 (Del. Ch. Jan. 31, 2013) ("For purposes of stating a duty of loyalty claim, what the Defendant Directors *should have known* is substantively less culpable, for liability purposes, than what they *actually knew*.") (emphasis in original); *Lenois v. Lawal*, 2017 WL 5289611, at *18 (Del. Ch. Nov. 7, 2017) (rejecting the claim that the board acted in bad faith where plaintiff had failed to well-plead that directors knew the financial advisor's opinions were false).

44

in the transaction other than pursuing the best interests of Blucora stockholders.[179]

Our fiduciary duty law does not work that way.[180]

As for the aiding and abetting claim against GCA, I reject Plaintiff's proposition that the Court may infer that a financial advisor knowingly participated in a breach of fiduciary duty merely because the advisor negotiated a fee structure that incented it to assist its client in reaching the goal of a consummated transaction. Nor is an inference of knowing participation supported simply because the advisor revised its analysis during the course of its engagement in a manner that is supportive of a proposed transaction.[181] In any event, having determined that Plaintiff has failed

---

[179] *See Citigroup*, 964 A.2d at 128 (rejecting plaintiff's invitation "to engage in the exact kind of judicial second-guessing that is proscribed by the business judgment rule," noting that "[i]n any business decision that turns out poorly there will likely be signs that one could point to and argue are evidence that the decision was wrong."). I note that Plaintiff has not pled waste. If he had, the claim would fail. He has pled no facts that would support an inference that the HD Vest transaction was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993).

[180] *Citigroup*, 964 A.2d at 126 ("[J]udicial second guessing is what the business judgment rule was designed to prevent[.]"). *See also Lyondell*, 970 A.2d at 243 ("[A]n extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties.") (internal quotations and citations omitted); *Houseman*, 2014 WL 1600724, at *7 (holding that the existence of "some process" will generally bar a finding of bad faith).

[181] *Malpiede v. Townson*, 780 A.2d 1075, 1095 n.78 (Del. 2001) (affirming this court's finding that no allegation indicated that the alleged aider and abettor knowingly participated in a fiduciary breach) (citing *Greenfield v. Tele-Commc'ns*, 1989 WL 48738, at *3 (Del. Ch. May 10, 1989) ("[S]ome facts must be alleged that would tend to establish, at a minimum, knowledge by the third party that the fiduciary was endeavoring to breach his duty . . . .")).

to plead a non-exculpated fiduciary breach with respect to the HD Vest acquisition, the claim that GCA aided and abetted that breach fails as a matter of law.[182]

### (b) The Monoprice Acquisition – Count III

Plaintiff's claim with respect to the Monoprice acquisition is more of the same improper second-guessing of the Board's acquisition strategy that animated his claim regarding HD Vest. Here again, Plaintiff alleges the Board recognized its duty of "oversight" when considering the Monoprice acquisition but did "little by way of due diligence," and "inexplicably disregarded" warnings and "red flags."[183] The FAC, and documents incorporated by reference, tell a different story. Specifically, the FAC alleges, among other steps, that the Board: (a) created the M&A Committee to identify acquisition targets and work with management to conduct due diligence[184]; (b) sent Allen to visit and evaluate Monoprice's facilities[185]; (c) enlisted an "internal corporate development team" to assess the transaction and assist in the review of sales metrics, website traffic and conversion rates[186]; and (d) analyzed with

---

[182] *See In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 1003 (Del. Ch. 2014) (holding that an aiding and abetting claim "may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against the director defendants."), *aff'd sub nom.*, *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[183] FAC ¶¶ 54–60.

[184] FAC ¶¶ 59–61.

[185] FAC ¶ 60.

[186] FAC ¶ 59.

management the benefits and risks of the transaction, including the competitive risk posed by Amazon.[187] At best, Plaintiff has alleged that perhaps the Board members "failed to do all that they should have under the circumstances."[188] This is a far cry from bad faith.[189] "Good faith, not a good result, is what is required of the board."[190]

---

[187] FAC ¶ 58.

[188] *Lyondell*, 970 A.2d at 243.

[189] *See City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 59 (Del. 2017) (holding that plaintiffs had improperly "conflate[d] the bad outcome . . . with the actions of the board"); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 (Del. Ch. 1996) ("The business outcome of an investment project that is unaffected by director self-interest or bad faith, cannot itself be an occasion for director liability."); *Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535, at *5 (Del. Ch. Oct. 28, 2014) ("Directors, not courts, are charged with weighing the costs and benefits of risk and making a decision about how much risk the firm should assume . . . .").

[190] *Reiter*, 2016 WL 6081823, at *14 (citing *Goldman Sachs*, 2011 WL 4826104, at *23). The purported "red flags"—the Amazon risk, the "deteriorating conversion" issue, and Monoprice's sketchy manufacturing facility in China—were, as Plaintiff concedes, all considered by the Board in its evaluation of the acquisition. *See* FAC ¶¶ 58–60. That the Board did not find these issues to be of such concern as to justify passing on the Monoprice acquisition does not a *Caremark* or bad faith claim make. *See In re Zale Corp. S'holders Litig.*, 2015 WL 5853693, at *15 (Del. Ch. Oct. 1, 2015), *as amended*, 2015 WL 6551418 (Del. Ch. Oct. 29, 2015) (holding that where "the Board specifically considered" the risks and alternatives cited by Plaintiff, "it cannot be said that they acted in bad faith."); *Citigroup*, 964 A.2d at 128 (noting that "[i]n any business decision that turns out poorly there will likely be signs that one could point to and argue are evidence that the decision was wrong."); *Corbat*, 2017 WL 6452240, at *18 (holding that failure to properly limit business risk is not recognized as a theory of director liability); *Bammann*, 2015 WL 2455469, at *14 (same).

47

### (c) The Stock Repurchases – Count IV

It is difficult to discern exactly what claim Plaintiff intends to state with respect to the Blucora stock repurchases. Whether cast as "waste" or simply "irrational," however, the FAC contains no facts suggesting that the Director Defendants lacked independence, were motivated by self-interest or consciously disregarded any known duty when they approved the repurchases. While Plaintiff alleges that the stock repurchases served "no rational business purpose" and "were contrary to common sense,"[191] without well-pled allegations that the Director Defendants were conflicted or that the transactions were illegal, Plaintiff's hindsight criticisms amount to nothing more than conclusory allegations that question how the Board decided to allocate Blucora's cash.[192]

As the Director Defendants correctly argue, "[i]f, *when*, and *how much* stock to repurchase are precisely the types of decisions that are subject to the business judgement rule and protected against judicial second-guessing."[193] And, while the

---

[191] FAC ¶¶ 85, 90.

[192] *See Frank v. Arnelle*, 1998 WL 668649, at *6 (Del. Ch. Sept. 16, 1998) (enumerating several legitimate business reasons why a board might authorize a company to repurchase stock).

[193] Opening Br. in Supp. of Director Defs.' Mot. to Dismiss 22 (citing *Lyondell*, 970 A.2d at 243–44) (D.I. 33).

Plaintiff makes a cursory reference to waste,[194] the FAC's allegations fall well short of satisfying the "extreme test"[195] for waste that requires Plaintiff to plead that the market-priced repurchases[196] were "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[197]

### (d) The *Brophy* Claims – Count V

In Delaware, the general rule is that "corporate officers and directors may purchase and sell the corporation's stock at will, without any liability to the corporation."[198] Our law recognizes an exception to this rule, and that an insider's trade may be deemed a breach of the fiduciary duty of loyalty, when: (1) "the corporate fiduciary possessed material, nonpublic information"; and (2) "the corporate fiduciary used that information improperly by making trades because she

---

[194] FAC ¶ 87.

[195] *Zucker v. Andreessen*, 2012 WL 2366448, at *8 (Del. Ch. June 21, 2012).

[196] FAC ¶¶ 85, 90.

[197] *Glazer*, 658 A.2d at 183. *See Citigroup*, 964 A.2d at 137 (rejecting waste claim in connection with stock repurchases); *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *8 (Del. Ch. Mar. 31, 2009) (same); *Chrysogelos v. London*, 1992 WL 58516, at *5 (Del. Ch. Mar. 25, 1992) (repurchases at 25% premium above market were not waste).

[198] *Tuckman v. Aerosonic Corp.*, 1982 WL 17810, at *11 (Del. Ch. May 20, 1982).

was motivated, in whole or in part, by the substance of that information."[199] For the reasons explained below, Plaintiff's *Brophy* claims against the CIG Defendants, Snyder and Allen fail as a matter of *prima facie* pleading.

First, Plaintiff has not alleged what material, nonpublic information Snyder and Allen possessed that the market did not. On November 5, 2013, Blucora released its 3Q13 earnings results and provided guidance for 4Q13. The challenged sales occurred promptly thereafter. Plaintiff's allegation that because they were on the Board and in management, respectively, Snyder and Allen must have obtained some additional material, nonpublic information regarding Monoprice's 4Q13 financial performance following Blucora's public guidance is wholly conclusory and insufficient to support an insider trading claim.[200]

Second, Plaintiff has failed to well-plead scienter. Specifically, he has failed to plead facts to support a reasonable inference that "each sale by each individual defendant was entered into and completed *on the basis of, and because of*, adverse

---

[199] *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005) (clarifying the elements a plaintiff must show to prevail on a *Brophy* claim).

[200] *See Rattner*, 2003 WL 22284323, at *10 (holding that to plead defendants possessed information by "virtue of their positions," a complaint must allege "the precise roles that [the defendants] played at the [c]ompany and the information that would have come to their attention in those roles."). Plaintiff's conclusory allegations that Snyder and Allen knew that the Monoprice acquisition would fail do not support a *Brophy* claim for the same reasons they fail to state bad faith claims and for the additional reason that the risks were disclosed to the market in connection with the Board's recommendation of the transaction to stockholders. Jan. 31 Will Aff., Ex. Z (Blucora Form 10-Q dated Nov. 5, 2013) at 52.

material non-public information."[201]  In this regard, "[n]o inference can be drawn from th[e] simple fact" that defendants "engaged in trades shortly after [the company engaged in a transaction or released financial information]."[202]  Nor can the Court infer scienter based only on the size of the trades.[203]  Pled facts, not speculation, must support a finding of scienter.  Yet Plaintiff rests his *Brophy* claims on nothing more than a hunch that Snyder and Allen engaged in "improper" trades.  That is insufficient as a matter of law.[204]

## III.  CONCLUSION

Based on the foregoing, I am satisfied Plaintiff has failed adequately to plead demand excusal and, in any event, has failed to plead viable claims upon which relief may be granted.  Accordingly, the Motions to Dismiss the FAC with prejudice must be **GRANTED**.

**IT IS SO ORDERED.**

---

[201] *Rattner*, 2003 WL 22284323, at *11 (emphasis supplied).  *See also Guttman*, 823 A.2d at 505 (noting that insider trading claims in Delaware "depend importantly on proof that the selling defendants acted with scienter.").

[202] *Guttman*, 823 A.2d at 497, 503–04.

[203] *Id.* at 504.

[204] *See Rattner*, 2003 WL 22284323, at *12.